GUARDIANSHIP OF LAWRENCE ALLEN BASSETT.

Hampshire.    January 3, 1979. — February 16, 1979.

Present: HALE, C.J., GRANT, & GREANEY, JJ.

*Mentally Retarded Person. Probate Court*, Guardian. *Guardian. Rules of Civil Procedure.*

The Probate Court had authority under both G. L. c. 201, § 6A, and c. 215, § 6, to appoint a guardian for a mentally retarded individual who was found to be incompetent to handle "some but not all" of his affairs and that authority included the power to appoint a corporate guardian acting through a committee. [61-65]

In a proceeding under G. L. c. 201, § 6A, for appointment of a guardian for a mentally retarded individual, the Probate Court could exercise its equity powers under c. 215, § 6, with respect to the terms of the guardianship without the need of a separate action under c. 215. [65-67]

PETITION filed in the Probate Court for the county of Hampshire on June 6, 1977.

The case was heard by *Jekanowski*, J., and questions of law were reported by him.

*James B. Fox & Jonathan Brant,* Assistant Attorneys General, for the Department of Mental Health, submitted a brief.

GREANEY, J. Acting on a petition brought under G. L. c. 201, § 6A, seeking the appointment of a guardian of the person and property of Lawrence Allen Bassett (Bassett), a mentally retarded person, a judge of the Probate Court for Hampshire County, after appointing a guardian ad litem to represent the prospective ward's interests and conducting a lengthy hearing, appointed the Belchertown State School Friends Association, Inc. (Friends Association), as guardian of Bassett's person and property. Troubled by questions as to the source and scope of the court's authority to create the guardianship, and the correct procedure to be followed in such a case, the probate judge reported five questions concerning those issues to this court.[1] We now proceed to dispose of the underlying issues raised by the questions reported.

The procedure followed, and the facts that led to the appointment of the guardian, may be summarized as follows: On May 26, 1977, the superintendent of the Belchertown State School (a facility of the Massachusetts Department of Mental Health) petitioned the court for appointment of the Friends Association as the guardian of Bassett's person and estate. The petition alleged that Bassett was "a person mentally retarded to the degree that he is incapable of making informed decisions with respect to the conduct of his personal and financial affairs . . . [and] that failure to appoint a guardian . . . will create an unreasonable risk to his health, welfare and property . . . ." The court, as required by G. L. c. 201, § 7, gave notice on the petition.[2] The judge then appointed a guard-

---

[1] The report was made pursuant to the provisions of G. L. c. 215, § 13, as amended through St. 1975, c. 400, § 59.

[2] Notice consisted of the issuance of a citation to Bassett, to his heirs apparent and presumptive, and to the Massachusetts Department of Mental Health. The notice was to be served by delivery to Bassett and by delivery or mailing to "all other persons interested" and "unless it

ian ad litem to represent Bassett's interests. The guardian ad litem filed a report assenting to the appointment of the Friends Association as guardian of Bassett's property but objecting to its appointment as guardian of his person, recommending instead the appointment of a person from the staff of the school.

The evidence indicated that Bassett at the time the petition was filed was twenty-one years old and that he had been a resident of Belchertown for a considerable length of time. He has been diagnosed as having moderate mental retardation, which is one of three categories of retardation — profound, moderate, and mild.[3] Bassett, though he suffers from retardation, has developed certain minimal skills and ability. However, he still is unable to make important and substantial decisions. For example, he possesses some basic educational skills but cannot read or write. He can count to about ten. He is able to determine how he would like to spend his free time and what clothes he would like to wear, but he lacks the

shall appear that all persons interested have received actual notice" by publication for three successive weeks in the Belchertown Sentinel. The return on the notice indicates that a copy was delivered to Bassett and that no service was made on the "heirs as there are no known heirs". At the hearing the court was informed that Bassett's mother was deceased and that his father was of parts unknown but that Bassett had a half-brother and two half-sisters. These persons were not notified. The question as to the need to notify them is not before us, and we express no opinion on that issue.

[3] General Laws c. 201, § 1, as amended through St. 1974, c. 845, § 2, defines a mentally retarded person for its purposes as "a person who, as a result of inadequately developed or impaired intelligence, is substantially limited in his ability to learn or adapt, as determined in accordance with established standards for the evaluation of a person's ability to function in society."

The evidence indicated that the three categories of retardation are based on a person's intelligence quotient measured by standardized tests and other factors. Bassett's I.Q., based on testing done when he entered the school and periodically updated, fell within the range of thirty-six to fifty-one. The etiology of his condition was unknown, and he was diagnosed at the time of the hearing as moderately retarded with other, unspecified conditions.

ability to understand or process the information that would be necessary for him to make larger decisions, such as when to seek medical assistance, how to arrange to rent and maintain an apartment, or how to handle an amount of money in excess of $10.00. If he leaves the school, he must be accompanied.

His condition is recognized as not a "static-forever kind of thing", and he has the potential for considerable improvement, even to the point of being able to leave the institution and live in a group home or home-care atmosphere if certain of his present needs can be addressed in a more direct and positive way.[4] These needs arise to some extent from the environment of the school itself. Beset with difficulties in the past, such as overcrowding, lack of funds, and inadequate staffing, the school has shown significant improvement in terms of meeting the requirements of its patients in recent years but is still unable to provide the type of individual relationship that would prove beneficial to persons in Bassett's condition. Of the approximately 650 patients resident at the school when the petition was heard, approximately 250 have guardians, and the staff makes frequent contacts with the guardians. Of the remaining number it was estimated that approximately 200 would benefit from the appointment of a guardian. It was agreed that the environment in which a retarded person finds himself is important to his well being and potential for growth and that the atmosphere at Belchertown is "neglectful" because there is not enough staff fully to promote the interpersonal relationships that most benefit the patients. There was also

---

[4] In December, 1976, he was placed in attendance at Pathfinder Regional High School, which allows him to spend his time "constructively", whereas in the past he spent "a lot of time wandering around the grounds." At age twenty-two he will be dropped from this program because the school committee is not responsible for anyone of that age, and he will not receive the type of help he needs to continue his schooling unless someone is "actively involved [who] could look for an alternative program and source of funding."

agreement that the presence of an "active and concerned guardian" would be most helpful in exploiting Bassett's ability for growth and improvement, would assist him in making the important decisions that he is incapable of making at this time by himself, and would supplement the attenuated assistance he receives from the staff of the school.

The evidence indicated that the Friends Association was prepared to provide that assistance. Incorporated in a nonprofit status, it seeks to support the rights of mentally retarded persons and to give them assistance. One of its functions, under its corporate form, is to provide guardians for retarded patients at Belchertown. It sought to be appointed as guardian of Bassett's property and planned to handle the guardianship of his person through a committee of three. The proposal as given to the Probate Court named three persons who would serve on the committee and stipulated that one of the three would be available at all times to assist Bassett in making important personal decisions, handling his funds, counseling him, and providing an appropriate social atmosphere for him. After a close examination of the three members of the Friends Association who would act as the guardianship committee, and persuaded by all of the circumstances brought to his attention, including the report of the guardian ad litem and a clinical team report[5] (concluding that a guardian was needed), the judge found Bassett competent to handle "*some* but not *all* of his personal and financial affairs," found that failure to act would create an unreasonable risk to Bassett, and appointed the Friends Association as his guardian. The judge then ordered that "a guardianship plan" be filed

[5] General Laws c. 201, § 6A, requires that a clinical team consisting of a physician, a licensed psychologist, and a social worker, each of whom is experienced in the evaluation of mentally retarded persons, examine the prospective ward to determine and report as to his capability to make informed decisions with respect to the conduct of his personal and financial affairs.

which would include, among other things, a statement of the particular needs, disabilities, and development potential of Bassett, and which would prepare a program of specific action to assure the protection of the ward's health, welfare, and property by securing for him all necessary and desirable social, rehabilitative, and other services. After entering a judgment formalizing the foregoing orders, the judge reported five questions which troubled him.

1. The first series of questions reported is concerned with the authority of the court to appoint a guardian for someone who is incompetent to handle "*some* but not *all*" of his affairs and whether a guardianship of the type approved here (a corporate guardian acting through a committee and authorized to construct a plan for the ward) can properly be appointed under the provisions of G. L. c. 201, § 6A.[6] Implicit in the questions is a concern as to whether the court, in order to perfect the type of arrangement sought here, must go beyond c. 201, § 6A, to invoke the equity powers conferred by G. L. c. 215, § 6.[7] We find sufficient basis in c. 201 to authorize the guardianship. We also perceive no problem in the court's use of the powers conferred on it by c. 215, § 6, if also needed to make the appointment or fully to develop the scope and terms of the guardianship in the future.

---

[6] General Laws c. 201, § 6A, as amended through St. 1978, c. 478, § 95, provides in pertinent part that if a Probate Court "finds that the person is mentally retarded to the degree that he is incapable of making informed decisions with respect to the conduct of his personal and financial affairs, that failure to appoint a guardian would create an unreasonable risk to his health, welfare and property, and that appointment of a conservator . . . would not eliminate such risk, it may appoint a guardian of his person and estate."

[7] General Laws c. 215, § 6, as appearing in St. 1975, c. 400, § 55, provides in pertinent part that "[p]robate courts shall have original and concurrent jurisdiction with the supreme judicial and superior courts of all cases and matters of equity cognizable under the general principles of equity jurisprudence . . . . Probate courts shall also have jurisdiction . . . . of all cases and matters in which equitable relief is sought relative to . . . (*vi*) . . . guardianship or conservatorship . . . ."

Probate Courts are courts of superior and general jurisdiction as to all matters within the scope of their statutory powers.[8] They are considered to possess a modicum of inherent power necessary to handle properly all matters within their jurisdiction. Lombard, Probate Law and Practice § 941 (1962). The resolution of problems involving people who are not competent and persons with social disabilities has always been considered as within the traditional, equitable power of a Probate Court, *Buckingham* v. *Alden*, 315 Mass. 383, 387 (1944); *Russell* v. *Russell*, 336 Mass. 762, 763 (1958), and has been confirmed as belonging to that court by statute. G. L. c. 201.

More recently, by St. 1974, c. 845, § 4, inserting § 6A into c. 201 of the General Laws, the Legislature saw fit to supplement this jurisdiction as to persons with social disabilities by recognizing and making provision for the special problems that affect mentally retarded persons and by providing that guardians can be appointed for them. The procedure for such appointment was fully set out in the amendatory legislation, which authorizes the court to appoint a guardian if the person whose case it is considering is so retarded that he is incapable of making informed decisions concerning the conduct of his personal and financial affairs and if failure to appoint the guardian would create an unreasonable risk to that person's health, welfare and property. The statute also establishes several prophylactic mechanisms with reference to the appointment of the guardian and to the rights of the retarded ward, including the need for a report of a clinical team (see note 5, *supra*), the appointment of counsel or a guardian ad litem for the prospective ward, and the proviso that no guardian shall be appointed who is unable to act in the best interests of the mentally retarded person. By its terms, § 6A contemplates the appointment of

---

[8] G. L. c. 215, § 2. *Kennedy* v. *Simmons*, 308 Mass. 431, 432 (1941). *Buckingham* v. *Alden*, 315 Mass. 383, 387 (1944). *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 755 (1977).

a group such as the Friends Association when it author-
izes the appointment of a nonprofit corporation. This
statute giving the Probate Courts jurisdiction over the
appointment of guardians for retarded persons strikes us
as establishing a legislative scheme designed to give the
court what it needs to serve the problems of retarded
persons as completely as possible, particularly where it
authorizes any guardian appointed to utilize the services
of agencies and individuals to provide necessary and
desirable social and protective services of different types
appropriate to the needs of the ward.

In addition to the measure of jurisdiction granted to it
by c. 201, § 6A, a Probate Court receives under (vi) of the
second paragraph of G. L. c. 215, § 6, a grant of general
equitable power to act in all matters relating to guardian-
ships. The grant of jurisdiction in this statute is plenary
and complements, on matters of guardianship, the pow-
ers conferred in G. L. c. 201, § 6A.

We believe that it was within the authority of the pro-
bate judge to make the findings and orders that he did
here, whether the judge is viewed as acting under G. L.
c. 201, § 6A, or under G. L. c. 215, § 6, in pursuit of the
polestar of any guardianship, the best interests of the
ward. See *Woodworth* v. *Spring*, 4 Allen 321, 326 (1862);
*King* v. *Dolan*, 255 Mass. 236, 237 (1926); *Wilkins* v. *Wil-
kins*, 324 Mass. 261, 262 (1949).

We also believe that it puts no great strain on § 6A to
find that it warrants the appointment of a guardian for
a mentally retarded person who lacks decision-making
capability as to some but not all of his personal affairs. If
§ 6A were construed to require that the ward possess no
decision-making powers at all before a guardian could be
appointed, then Bassett and similarly retarded individu-
als who possess some degree of self-sufficiency yet need
substantial help could not approach the court. A failure
to act in this regard might expose Bassett and others
similarly disabled to a substantial and unreasonable risk,
leave them cut off from resources which might enable

them better to handle their affairs, and deprive them of
prospects of significant development.[9]

Once the court's protective jurisdiction attaches, it "is
not limited by any narrow bounds, but it is empowered to
stretch forth its arm in whatever direction its aid and
protection may be needed." *In re Quinlan*, 70 N.J. 10, 45,
cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922
(1976), quoting from 27 Am. Jur. 2d Equity § 69 (1966). Its
authority is broad and flexible enough to "afford what-
ever relief may be necessary to protect [the ward's] inter-
ests," *Strunk* v. *Strunk*, 445 S.W. 2d 145, 147 (Ky. App.
1969), "in the sound judgment of the probate judge, to be
exercised with an eye single to the welfare of the ward."
*King* v. *Dolan*, 255 Mass. at 237.

Here the probate judge had before him sufficient evi-
dence to find that Bassett needs a guardian to handle
some of his affairs and that with proper help he can
improve dramatically. The appointment of the Friends
Association is the appointment of an organization con-
templated by the statute, and the order that a plan be
developed is within the power of the court to create and
monitor a guardianship that will act in the best interests
of the ward. All of this can be done, we believe, under a

---

[9] General Laws c. 201, § 45, as amended through St. 1974, c. 845,
§ 16, adds support for this conclusion. In pertinent part it provides
that "if property, rights, or benefits given by . . . law depend upon the
election, waiver or other act of a person incompetent by reason of . . .
mental retardation . . . to perform the same, his guardian may make
such election or waiver or perform such act . . . ." This section, when
read with § 6A, impresses us as conferring upon a Probate Court the
authority to appoint a guardian for someone who is partially incompe-
tent and permits it to exercise its continuing jurisdiction over the
guardianship to distinguish those areas in which the guardian re-
quires authority to act from those areas in which the ward is compe-
tent to handle his own affairs. See also *Lane* v. *Candura*, 6 Mass. App.
Ct. 377 (1978), where we contemplated situations in which a patient,
while competent in other respects, might need a guardian because of
incompetency to make a specific medical decision, a situation analo-
gous to that of a moderately retarded individual who can make some
but not all decisions for himself.

combination of the powers conferred by G. L. c. 201, § 6A, and by G. L. c. 215, § 6, both harmonizing to a common goal, without the need to become overly concerned over which statute is being used at any given point.

2. The final series of questions posed by the probate judge is concerned with the procedure to be followed in implementing the guardianship. The judge's dilemma arises from a perceived conflict between the procedural mechanisms contained in c. 201, § 6A, and those called for in c. 215, § 6. No matter which statute is used, the result is the same, namely, the use of the general statutory and equity jurisdictions of the court to act in all matters regarding the guardianship without undue emphasis on procedural details.

A guardianship proceeding under G. L. c. 201, § 6A, is by the terms of §§ 6A and 7, to be initiated by petition and notice. Matters under G. L. c. 215, § 6, are "governed by the Massachusetts Rules of Civil Procedure." Rule 1 of the Massachusetts Rules of Civil Procedure, 365 Mass. 730 (1974), provides that those rules govern procedure "in the Probate Court in proceedings seeking equitable relief." Rule 3, 365 Mass. 733 (1974), and rule 4, as amended effective January 1, 1976, 369 Mass. 997, require all civil actions to be commenced by a complaint and a summons. The probate judge is uncertain in this case, since he apparently relied in part on c. 215, § 6, in creating the guardianship and outlining its terms, whether the parties were required to commence dual proceedings — a petition under G. L. c. 201, § 6A, and, simultaneously or later, a complaint under G. L. c. 215, § 6,[10] in conformity with the Massachusetts Rules of Civil Procedure. The problem arises from the traditional separation of the strictly probate and equity functions of a Probate Court

---

[10] At the Probate Court hearing the register of probate testified as a friend of the court about a problem in docketing the guardianship petition, since the registry maintains separate dockets for petitions under c. 201 and for equity matters under c. 215, § 6. This administrative problem will be resolved by the approach we take today.

— a separation the Rules continue to some extent — the appointment of guardians falling within the former (and commenced by petition) and equity matters pertaining to guardianships falling within the latter (and commenced by complaint), with an admitted fusion of the two functions in many circumstances.[11]

Since G. L. c. 201, §§ 6A and 7, expressly direct the commencement of the proceedings by way of petition and notice, that is the clear and obvious way to start them, and we see no great procedural obstacle if the court uses c. 215, § 6, to flesh out its actions with regard to the guardianship without a second proceeding, treating the petition and notice as the equivalent of a complaint and summons for that purpose.

The Massachusetts Rules of Civil Procedure are designed to simplify civil practice in the Commonwealth and are to be interpreted so as to secure the "just, speedy, and inexpensive determination of every action." Mass.R. Civ.P. 1. *Giacobbe* v. *First Coolidge Corp.*, 367 Mass. 309, 315 (1975). *Gilmore* v. *Gilmore*, 369 Mass. 598, 602 (1976). "All pleadings shall be so construed as to do substantial justice." Mass.R.Civ.P. 8(f), 365 Mass. 751 (1974). Rule 81(d), 365 Mass. 842 (1974), provides that "in applying these rules to any proceedings to which they apply, the terminology of any statute which also applies shall, if inconsistent with these rules, be taken to mean the analogous device or procedure proper under these rules." We believe that the use of terminology such as "complaint" and "petition" does not, and should not, serve as a restraint on a court's exercise of its plenary jurisdiction

---

[11] Since § 6A and the procedural apparatus it adopted for commencing a guardianship was enacted after the adoption of the amendment of G. L. c. 215, § 6, which was effected by St. 1973, c. 1114, § 63, it can be assumed that the Legislature when it passed § 6A was aware of the change it had made in c. 215, § 6, that proceedings under that section should be governed by the Rules, and that by adopting the petition and notice procedure for §§ 6A & 7 acquiesced in its continued use as a method of seeking appointment of a guardian.

over a guardianship proceeding, particularly where, as in this case, such an interpretation might cause some injustice by way of delay to an individual who would suffer from a limited construction of the rules. A harmonious reading of the statutes and of the Rules in light of the purposes of each leads us to conclude that a probate judge can treat a petition filed under G. L. c. 201, § 6A, as the functional equivalent of a complaint filed under G. L. c. 215, § 6, and treat the order of notice issued under G. L. c. 201, § 7, as the functional equivalent of a summons issued under Mass.R.Civ.P. 4. Minor variations between the two forms of procedure, most noticeably the setting of a return day under the petition when objections are to be filed, are inconsequential to the main thrust of the pleading as a whole and to the ultimate goal of the proceedings. In commenting on the Rules in a different context, the Supreme Judicial Court appropriately noted, "We would be loath to renew the futile paper chase for the supposedly exact pleading, and shall resist any tendency so to interpret the new Rules contrary to their purpose and spirit." *Charbonnier* v. *Amico*, 367 Mass. 146, 153 (1975).

We, conclude, therefore, that the judge properly exercised his powers to appoint a guardian for limited purposes and with specified responsibilities and that he could so act without resort to a second proceeding initiated specifically under c. 215, § 6, and the Rules.

The questions reported having been answered, the case is remanded to the Probate Court for such further proceedings as may be appropriate and consistent with this opinion.

*So ordered.*