IN THE MATTER OF CHRISTOPHER DAVID MCKNIGHT
(and a companion case[1]).

Bristol. October 4, 1989. - March 6, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Mentally Retarded Person. Mental Health. Guardian,* Incompetent person. *Probate Court,* Guardian, Incompetent person, Jurisdiction. *Injunction. Due Process of Law,* Mental health. *Constitutional Law,* Equal protection of laws, Separation of powers, Judiciary.

A Probate Court judge incorrectly issued a preliminary injunction in a civil action in which a party seeking injunctive relief had alleged no basis for a finding of a violation of its rights under a prior settlement agreement and in which that party did not demonstrate that its interests were threatened with irreparable harm. [790-791]

Statement concerning the authority of a Probate Court judge to fashion equitable remedies in guardianship matters involving State agencies and the expenditure of public funds. [791-792]

Comment on the procedural history of a civil action brought with the intention to assert the rights of a person under guardianship seeking funded treatment from the Department of Mental Retardation. [792-793]

On the record presented in a proceeding in the Probate Court, the judge was without authority to issue a preliminary injunction directing a specific placement through which the Department of Mental Retardation was to fulfil its obligation to provide treatment and habilitation to a certain individual who was entitled to such services, and the case was remanded with instructions for further proceedings. [797-799, 801-802] LYNCH, J., concurring. LIACOS, C.J., dissenting.

In the circumstances of a proceeding in the Probate Court concerning a severely retarded person, the judge had authority to issue a preliminary injunction requiring the Department of Mental Retardation to continue to make aversive therapy available to the individual, pending a determination after trial of his right to habilitative services and of the department's obligation to provide them. [799-801]

---

[1]Behavior Research Institute, Inc., & others *vs.* Director of the Massachusetts Office for Children & another.

CIVIL ACTION commenced in the Bristol Division of the Probate and Family Court Department on February 28, 1986.

Petition filed in the Bristol Division of the Probate and Family Court Department on August 3, 1987.

A motion for a preliminary injunction, filed on February 27, 1989, was heard by *Ernest Rotenberg*, J.

The Supreme Judicial Court granted requests for direct appellate review.

*Judith Fabricant*, Assistant Attorney General, for Department of Mental Retardation.

*Robert A. Sherman* (*Paul Michienzie* with him) for Arthur Duncan McKnight.

*Roderick MacLeish, Jr.* (*Susan B. Tuchman* with him) for Behavior Research Institute, Inc.

*Bettina A. Briggs* for the guardian ad litem.

*David Norris*, for Christopher David McKnight, submitted a brief.

*William Crane & Allan Macurdy*, for Massachusetts Federation for Children with Special Needs, Inc., & others, amici curiae, submitted a brief.

*Steven J. Schwartz & Cathy Costanzo*, for National Association for Rights Protection and Advocacy & another, amici curiae, submitted a brief.

*Stan Goldman & Kate Tobin*, for Mental Health Legal Advisors Committee, amicus curiae, submitted a brief.

WILKINS, J. · Christopher David McKnight, known as David, was born on November 8, 1966, and suffers from severe autism and severe to profound mental retardation. Since 1982, he has been enrolled for education and treatment at Behavior Research Institute, Inc. (BRI), a private, residential facility specializing in the treatment of behavior disorders. Until December, 1988, a school district in Wyoming, where David and his father once lived, funded David's care at BRI.[2] In February, 1989, BRI informed David's father,

---

[2] A description of David's experiences before he arrived at BRI appears

who was his Massachusetts-appointed guardian, that BRI
would terminate David as a client due to the lack of funding
for his enrollment. On February 27, 1989, David, through his
attorney, his father, his guardian ad litem, and BRI, moved
in the Bristol County Probate and Family Court for a pre-
liminary injunction against the Department of Mental Retar-
dation (department) that would require it to "provide [a]
safe and adequate treatment and habilitation program" for
David.

A judge conducted an evidentiary hearing on the motion,
made extensive findings of fact, and on March 30, 1989, en-
tered "Orders and Preliminary Injunction" that the depart-
ment pay BRI for the care of David at the approved rate.
See G. L. c. 6A, § 32 (1988 ed.). The judge authorized the
department to move to vacate the preliminary injunction if
the department were to propose an alternative habilitation
program satisfactory to the court.[3] We granted motions for
direct appellate review of the department's appeal from the
preliminary injunction.

We start with a general description of the two proceedings
in which the preliminary injunction was entered. One was a
Bristol County temporary and permanent guardianship pro-
ceeding involving David that had been commenced in Au-
gust, 1987, in which, on September 2, 1987, the judge, acting
on the basis of substituted judgment, issued a detailed plan
ordering treatment of David's "problem behaviors" by re-
wards and, if necessary, by so-called aversives. The other
proceeding was a class action brought by BRI and others
against the Director of the Massachusetts Office for Children

in *Natrona County School Dist. No. 1* v. *McKnight*, 764 P.2d 1039, 1042-
1044 & n.3 (Wyo. 1988).

[3]The relevant provision reads: "DMR may move to vacate this prelimi-
nary injunction at any time hereafter upon the submission and upon ap-
proval by the Court of a reasonably-conceived, competently-defined
clinical habilitation program sufficient to provide for Christopher David
McKnight's safety, habilitation and care, and which shall not cause him
harm."

to which the department became a party. On January 7, 1987, the judge, who was the judge who entered the preliminary injunction in this case, approved a settlement agreement concerning, among other things, authorization, by way of substituted judgment, of the use of aversive procedures on clients at BRI. For our purposes, the most significant provision in the settlement agreement required the Department of Mental Health and other State agencies to "give B.R.I. equal consideration with all other private providers for new clients referred for private placement by state agencies."

It was under the captions of these two proceedings that the motion was filed on February 27, 1989, as noted above, seeking a preliminary injunction "restraining the Departments of Mental Health and Retardation from failing to provide [a] safe and adequate treatment and habilitation program for David McKnight, given that he suffers from mental retardation and/or a major mental illness and that failure to provide services would pose a likelihood of immediate serious irreparable harm, of a life-threatening nature." The motion was signed by counsel for BRI, although it made no claim of contempt of court for violation of the approved settlement agreement, nor did it make any representation concerning BRI's right to seek relief for David on the basis of that settlement. Moreover, the motion alleged no theory on which the department might be obligated to provide the treatment and habilitation program sought.

The judge issued an order of notice on the same day, scheduling a March 6, 1989, hearing and ordering that the parties be prepared to respond to two issues: "a. Whether the [department] or the Commonwealth is obligated to provide services to the ward which are sufficient to keep him safe and which will prevent him from regressing," and "b. Why BRI was not considered by [the department] as a facility to provide services to the ward." The record does not disclose how the issues came to be stated as they were in the order of notice. Certainly, the motion for a preliminary injunction did not present them explicitly.

Although the judge justified his authority to issue the preliminary injunction in part on his continuing jurisdiction over both the action brought by BRI and the implementation of the settlement agreement in that action, there is nothing in that settlement agreement that justified entry of the preliminary injunction. That agreement gave David no right to be treated at BRI. If the department failed to give BRI equal consideration with other providers, it might be liable for breach of the agreement and perhaps for contempt of court. However, neither of these theories was asserted in the motion as a basis for issuance of the preliminary injunction. Even if the department had violated BRI's rights under the settlement agreement, there was no showing that BRI's interests were threatened with irreparable harm sufficient to justify the entry of a preliminary injunction.

The orders and preliminary injunction entered in the action brought by BRI and others shall be vacated, and the motion for a preliminary injunction in that action shall be denied without prejudice to BRI's right to pursue any violation of its rights under the settlement agreement on a proper complaint or motion. If entry of the preliminary injunction was appropriate, it was because of rights that David had against the department, a question we next consider.

The Probate Court judge had broad powers to act in the best interests of David by fashioning equitable remedies. See G. L. c. 201, § 6A (1988 ed.); G. L. c. 215, § 6 (1988 ed.); *Matter of Moe*, 385 Mass. 555, 563 (1982); *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 755-756 (1977); *Guardianship of Bassett*, 7 Mass. App. Ct. 56, 64-65 (1979). We have no doubt that the judge's order was intended to be in David's best interests. If that order had not involved a State agency and the expenditure of public funds, there would be no reasonable basis to challenge the direction, at the guardian's request, that David be treated at BRI.

The guardianship, however, did not invest the Probate Court with the authority to order the department to do anything that the department was not willing to do or required

to do as a matter of law. A court, of course, may not properly exercise the functions of the executive branch of State government. See *Guardianship of Anthony*, 402 Mass. 723, 727 (1988). On the other hand, a court has the right to order the department to do what it has a legal obligation to do. *Id.* *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 629-630 (1985). Where the means of fulfilling that obligation is within the discretion of a public agency, the courts normally have no right to tell that agency how to fulfil its obligation. *Id.* at 630. See *Bradley* v. *Commissioner of Mental Health*, 386 Mass. 363, 365 (1982). Only when, at the time a judicial order is entered, there is but one way in which that obligation may properly be fulfilled, is a judge warranted in telling a public agency precisely how it must fulfil its legal obligation. See *Guardianship of Anthony*, *supra* at 727; *Attorney Gen.* v. *Sheriff of Suffolk County*, *supra* at 630.

Before we turn to the questions whether the department had any legal obligation to care for David and, if it did, whether the only way the department could fulfil that obligation was to pay for his care at BRI, we shall discuss our concerns about how the issues were raised in this case and then shall recite the factual background against which the answers to the questions of law must be decided.

The judge entered an order that he labeled a preliminary injunction, but that order was not preliminary to anything. The parties who sought the preliminary injunction are not now required to prove their case at a trial. By its terms the injunction can be vacated only if the department (not the plaintiffs) should make a particular factual showing. In legal and practical effect, the injunction is a permanent, not a preliminary, one.[4]

---

[4]A preliminary injunction is, by definition, an interlocutory order entered to preserve temporarily the status quo pending a full trial on the merits. See 11 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2947, at 423-424 (1973). A preliminary injunction remains in effect

A proper procedure for asserting David's rights against the department would have been the filing of a separate complaint or the filing of a motion to add the department as a party to the guardianship proceeding, alleging, in either instance, the grounds for the relief sought against the department and the nature of that relief. See G. L. c. 215, § 6; *Guardianship of Bassett, supra* at 64. The motion for a preliminary injunction fulfilled some aspects of this procedure, but it failed to recite any theory on which the department was responsible to act toward David, and it failed to request preliminary relief that would be followed by permanent relief after a trial. The department has not argued here that it was not properly advised of the issues of fact and law tried before the judge. Our comments on the procedural weaknesses in this case are intended, therefore, to be a guide for future cases.

David has a history of self-destructive behavior, including dangerous runaway behavior, biting himself, and the ingestion of inedible objects. He has permanent scars from bites to his hands and wrists. From February, 1977, to March, 1979, David was in BRI's residential facility in Seekonk, at the expense of his Wyoming school district. During that initial two-year stay, David's severe behavioral problems diminished greatly. Next, for one and one-half years, he was in a school in Arizona during which time his self-destructive conduct became worse. He then lived at home for a little more than a year, and, in early 1982, returned to BRI. David's behavioral problems have diminished since his return although his self-injurious behavior has not been completely eliminated. He still bites himself, particularly at night, and bangs his head

---

only until a final judgment is rendered. See *id.* at 427.

The injunction in this case goes much further than simply preserving the status quo until David can prove his case at trial. Indeed, it relieves David of his burden of proving anything at trial. Under the terms of the injunction, there will be no trial on the merits of David's claims. The judge effectively rendered a final determination of David's rights based on the evidence presented at the expedited preliminary injunction hearing. If one were to accept the dissent's view, every permanent injunction requiring continuing compliance with an order would be a preliminary injunction because it could be modified.

against walls. He is not aware of the danger posed by motor vehicles.

David is not verbal, although he can indicate when he wants to eat or drink. Food has been an effective reward in training David. On the rare occasions when he engages in tantrum-like behavior, two or more strong, specially trained staff members are required to control him.

David would be subject to severe regression if comprehensive residential behavioral treatment were to be suddenly withdrawn. David needs that treatment in order to be safe, and without it he poses a likelihood of serious harm to himself and others. The judge had previously approved the use of certain aversive procedures for David when necessary in order to direct and control his behavior. These include, in response to any aggressive or self-injurious behavior and subject to prior notice to the department and to certain clinicians, spanking, pinching, and squeezing (Level 3 aversives). The judge found that, if the use of aversive procedures were withdrawn, David would suffer harm, most likely from his own self-injury, and, consequently, he would be subject to harm if he were in either a short-term or a long-term placement where aversive treatment was not available. If David were to move successfully into a community program, the program would have to have at least the potential of using Level 3 aversives.

David's father moved to Massachusetts from Wyoming both for economic reasons and to be near David. After David attained the age of twenty-two and it seemed likely that continuing funding from Wyoming would cease, David's father, his court-appointed guardian, applied to the department for services on David's behalf. After a department psychologist assessed David and issued a report, the department determined that David was eligible for department services. Although the department's position concerning the place at which David might be treated changed from time to time, its final position was that it would place David temporarily in Samoset House, a residential respite program in Mansfield created to provide emergency placement for individuals with

behavioral difficulties. Samoset House does not provide aversive treatment to its residents.

The judge found that the department made its choice because of fiscal restraints. He rejected the department's conclusion concerning the appropriateness of Samoset House because, in his view, it lacked any factual or clinical basis. Samoset House with no aversive treatment available would, according to the judge, not be a safe place for David. David's place at Samoset House was already funded, and the department had identified $20,000 that would be available for supplemental services for David during the balance of the 1989 fiscal year. The funds the department designated as available were insufficient to pay BRI's charges for the care of David for the balance of the year. BRI's annual, approved rate was approximately $126,000. The annual cost to the department per funded position at Samoset House pursuant to contract was approximately $75,000. Substantial additional funds would be needed to enable Samoset House to monitor David on a twenty-four hour basis.

The judge concluded that, under the Constitutions of both the Commonwealth and the United States, David was entitled to a safe and appropriate "protective" living environment. It is a reasonable inference from his findings and rulings that the judge believed that David's constitutional right to services from the Commonwealth included placement in a facility that could provide aversive treatment if necessary to prevent David from regressing. The judge's discussion of the source of David's rights concentrated largely on the Constitution of the Commonwealth. He relied on due process of law principles expressed in arts. 10 and 12 of the Declaration of Rights,[5] a special right to affirmative protection that he perceived in the wording of art. 10 of the Declaration of Rights,[6] art. 114 of the Amendments to the Constitution con-

---

[5] Due process of law principles of the State Constitution are expressed by arts. 1, 10, and 12 of the Declaration of Rights and Part II, c. 1, § 1, art. 4. *Pinnick* v. *Cleary*, 360 Mass. 1, 14 n.8 (1971).

[6] The first sentence of art. 10 provides: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and

cerning discrimination against handicapped persons,[7] and principles of equal protection of the laws, finding an unconstitutional distinction made between the statutory rights to emergency treatment of mentally ill persons and mentally retarded persons.[8] He rejected the department's argument that,

property, according to standing laws." No case has said that art. 10 alone places an affirmative obligation on the Commonwealth to protect the life, liberty, or property of an individual at public expense beyond whatever obligations are imposed by statute or the common law. Cases involving art. 10 have generally concerned claims that special legislation has unconstitutionally favored one person at the expense of one or more other persons. See *Boston* v. *Keene Corp.*, *ante* 301, 306-308 (1989), and cases cited. We need not decide in this case whether art. 10, independent of its expression of due process of law rights, requires the Commonwealth to furnish services to David.

[7]Article 114 of the Amendments provides that: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." Even if we assume that a "program or activity" is involved in this case, we see no discrimination against David because of his handicap. All participants under the department's responsibility are handicapped to one degree or another. The department is not excluding David from anything because of his handicap. The recognition of handicapped persons as a class in art. 114 may influence certain analyses of the constitutional rights of handicapped persons. In the situation before the court, however, art. 114 has no application.

[8]The judge erroneously concluded that there was a denial of equal protection of the laws because an individual who was dangerous and mentally ill could obtain emergency care and treatment pursuant to G. L. c. 123, § 12 (1988 ed.), whereas a person who was mentally retarded and dangerous had no parallel right. Even if we accept that David is not mentally ill (his guardianship proceeding involved a determination that he was mentally ill) and thus § 12 is inapplicable to him, there is no denial of equal protection. Section 12 involves a civil commitment against the will of a person, and is not concerned with the long-term or involuntary treatment of that person. It is unclear how the absence of a precisely parallel statute similarly restricting the rights of retarded persons harms David or gives him (as a mentally retarded person) a basis for successfully claiming the denial of equal protection. In any event, G. L. c. 201, § 14 (1988 ed.), provides a reasonably parallel procedure for the admission of a mentally retarded person to a facility in an emergency. There is no basis on the record for concluding that dangerous mentally ill persons have been given some preference over dangerous mentally retarded persons that is relevant here. Moreover, even if there were such a difference, and if it were found to violate equal protection of the laws principles, it is not clear that the

because (as the department claimed) it had no funds appropriated for caring for David, the court had no constitutional authority to order the expenditure of public funds to pay BRI for services furnished to David.

Although the judge's ruling that the department had an obligation to provide for David was based on David's constitutional rights (and the briefs for David and BRI also express his rights as constitutionally based), this court is not likely to resolve an issue on constitutional grounds if the court may dispose of it by a consideration of rights created by statute and agency regulation. See *Beeler* v. *Downey*, 387 Mass. 609, 613 n.4 (1982).

We do not treat this case as one in which David voluntarily through his representatives sought assistance from the department in circumstances in which the department had committed all its appropriated funds elsewhere. By the time of the hearing on the preliminary injunction request, the department had concluded that David was eligible for services. See 21 Code Mass. Regs. § 21.02 (1987), a regulation of the Department of Mental Health applicable to the Department of Mental Retardation pursuant to 115 Code Mass. Regs. § 2.03 (1) (1987). It had also designated him a first priority applicant. 21 Code Mass. Regs. § 21.07 (4) (a) (1987). Because the department had found a placement for David and additionally had $20,000 available for his care during the balance of the fiscal year, David's right to care by the department and to the use of appropriated funds to pay for that care was established, regardless of whether he had a constitutional entitlement to care and payment for that care in the absence of available funding.[9]

---

constitutional violation would give David any right to the entry of a preliminary injunction of the scope that was entered here.

[9]We have suggested that the unavailability of appropriated funds would not justify the failure of prison officials to stop violating inmates' constitutional rights (a) to equal protection of the laws and (b) not to be subjected to cruel and unusual punishment. See *Blaney* v. *Commissioner of Correction*, 374 Mass. 337, 342 n.3 (1978). In such a case, if the authorities lack appropriated funds sufficient to perform all their duties without violating

The judge would have been warranted in entering an injunction (a) directing the department to provide care and protective services to David and (b) defining the level of care and protective services that the department was obligated to furnish David. Such an order would in effect have directed the department to carry out its lawful obligations. The remaining contested issues, therefore, become whether the judge properly directed the department to carry out its duties by (a) mandating the use of BRI and (b) directing (as was inherent in the preliminary injunction) that aversives be available and be used when necessary to prevent David from regressing.

The determination of where and how the department will carry out its statutory, regulatory, and any constitutional obligations, is, as we have already said, for it to decide. It is, of course, for a court to decide what those obligations are when a litigated question is presented to it concerning the scope of those obligations. The record does not support the conclusion that on a permanent basis BRI, and only BRI, can furnish the appropriate care for David. The injunction should have left the determination of where David is to be treated in the discretion of the department without requiring it to return to the court for approval of some other provider before David could be moved from BRI. The placement of individuals and the coordination of the provision of services financed by the department are executive functions. Individually focused judicial mandates impinging on those functions are not generally warranted and would be disruptive of attempts to carry out broad departmental policies. Such a mandate can be justified, as we noted earlier in this opinion, only if there is but

constitutional rights, a cure would be the early release of some inmates.

Where constitutional rights of a severely mentally retarded person are involved, the problem of inadequate funds may be more intense because the release of such a person may not be an available option. In this appeal, we need not consider whether, to protect David's rights (statutory or constitutional), the department, confronted with an appropriation proven to be insufficient to permit it to care for all persons within its responsibility, would have to deny services to mentally retarded persons less severely afflicted than David in order to be able to meet David's needs.

one way in which a governmental agency can carry out its lawful duties. See *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 630 (1985). That unique situation is not shown to exist in this case on a permanent basis.

There remains the question whether David is entitled to an order directing that his care include the use of aversives when necessary to prevent him from regressing. No statute or regulation explicitly grants him this right.

The parties have discussed David's due process right to care in terms of the liberty component of the due process of law provisions of the State and Federal Constitutions. They analyze views expressed in *Youngberg* v. *Romeo*, 457 U.S. 307, 316-319 (1982),[10] and the restrictive views of due process rights to care from the State found in *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 109 S. Ct. 998 (1989).[11]

---

[10]Speaking for a nearly unanimous Court in the *Youngberg* case, Justice Powell said: "If, as seems the case, respondent seeks only training related to safety and freedom from restraints, this case does not present the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*, even when no type or amount of training would lead to freedom." *Youngberg* v. *Romeo*, 457 U.S. 307, 318 (1982). Justice Blackmun, concurring in an opinion joined in by Justices Brennan and O'Connor, said: "The second difficult question left open today is whether respondent has an independent constitutional claim, grounded in the Due Process Clause of the Fourteenth Amendment, to the 'habilitation' or training necessary to *preserve* those basic self-care skills he possessed when he first entered Pennhurst — for example, the ability to dress himself and care for his personal hygiene. In my view, it would be consistent with the Court's reasoning today to include within the 'minimally adequate training required by the Constitution,' *ante*, at 322, such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment.

". . . For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know." (Emphasis in original.) *Id.* at 327 (Blackmun, J., concurring).

[11]In the *DeShaney* case, the United States Supreme Court held that an individual's due process rights were not violated when the State failed to provide him with adequate protective services against private violence. *Id.* at 1004. The Court distinguished circumstances discussed in *Youngberg* v.

The *DeShaney* case furnishes doubtful guidance in David's case. The Commonwealth has never taken any action concerning David, nor has it yet failed to act in a situation where it might have had an obligation to act. David was never in the custody of the Commonwealth, voluntarily or involuntarily, at any time before the injunction was issued. On the other hand, David's retardation is so severe that it is difficult to imagine that the department could ignore him, and it may well be that, at least under the State Constitution, the Commonwealth could not ignore him. The department has not ignored David and thus, as we have said, we need not decide whether it constitutionally could do so.[12]

Based on the evidence, which included strong support for the conclusion that David would be at risk if he were permitted to regress, the judge would have been warranted in issuing a preliminary injunction requiring the department to continue the availability of aversive procedures for David pending a determination of David's rights and of the department's obligations following a trial on the merits. See *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615

---

*Romeo, supra,* on the ground that a State's constitutional obligation to care for a person arises only when the State takes custody of that person against his will. *DeShaney, supra* at 1004-1006. The *DeShaney* opinion has been criticized for failing to recognize, and to give effect to, the significant role the State of Wisconsin played by omission in the harm that came to Joshua DeShaney. See *id.* at 1010-1011 (Brennan, J., dissenting); *id.* at 1012 (Blackmun, J., dissenting) The *DeShaney* decision has also been described as broad and harsh. See *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc.* v. *Philadelphia*, 874 F.2d 156, 166 (3d Cir. 1989).

[12]We find the Supreme Court's distinction between the rights of persons involuntarily held by the State and those not so held to be uninstructive in the case of a person like David. By application of principles of substituted judgment, one might expect that David would "voluntarily" accept placement and care by the department. If "he" did so, however, the *DeShaney* opinion suggests that, if the Commonwealth omitted some needed level of care, it would not be denying due process of law to David, who, in a substituted judgment sense, would be voluntarily in the Commonwealth's custody. A more sophisticated exercise of substituted judgment might reject care by the Commonwealth, in the hope that the Commonwealth would hold David involuntarily (against "his" substituted judgment), and thus implicate a liberty interest under Federal due process principles.

(1980).[13] No permanent injunction should be entered to that effect, however, unless David proves that the department, acting on the judgment of qualified professionals, could not reasonably deny the continued availability and use of aversives, when necessary. If accepted professional practice would tolerate the unavailability or the nonuse of aversives for David (if only temporarily) and the department elects to follow that professional practice, the courts must respect that judgment. We reject the possibility that David has a constitutional right to elect (pursuant to substituted judgment principles) among placements and treatment procedures that are acceptable to qualified professionals. If it is not inherent in the department's statutory and common law obligations (see G. L. c. 123B, § 2 [1988 ed.]; 104 Code Mass. Regs. § 20.21 [1] [1987]) that it must treat David according to accepted professional practice (cf. *Youngberg* v. *Romeo*, *supra* at 323), we might expect to find such an obligation under State due process of law principles. Cf. *Nason* v. *Superintendent of Bridgewater State Hosp.*, 353 Mass. 604, 611-612 (1968) (treatment of confined mentally ill persons).

This case concerns the proper exercise of judicial authority. In deciding that issue, we need not concern ourselves with various facts additionally recited in the dissent. We do not, as the dissent says, ignore the significant parts of the record, defer to the department, or decline to accord appropriate deference to the judge's findings. The course of the department's treatment of David was not in the highest tradition of responsible administration. The cure, as we have said, is to define the department's duties and to direct the department to comply with the law. In the absence of an abdication of its function, it is not, however, appropriate for a judge to exercise the department's executive functions. See *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703, 736 (1980) (repeated or continuous failures of officials to comply with a previously issued decree; continued intransigence); *Blaney* v.

---

[13]As a practical matter, such an order might have required the department to leave David at BRI, at least for some months.

*Commissioner of Correction*, 374 Mass. 337, 343 (1978) (specific directions concerning the continued classification of protective custody inmates issued only after persistent failures of the defendants to fulfil their duties as defined by judicial orders). The circumstances of this case, therefore, did not warrant a judicial directive that the department care for David in BRI on a permanent basis.

The preliminary injunction is vacated in each proceeding. The proceedings are remanded to the Probate and Family Court where, following the filing of an amended complaint in the guardianship proceeding, the judge may enter a preliminary injunction consistent with this opinion (and the then-existing circumstances)[14] and a trial on the merits may be held at which David may seek to prove that accepted professional practice requires that he have available and, when necessary, receive care and treatment of a particular kind. In the action brought by BRI and others, the motion for a preliminary injunction shall be denied without prejudice to BRI's right to seek relief from any violation of the settlement agreement.[15]

*So ordered.*

LYNCH, J. (concurring). I concur in the result. I write separately, however, to reject any suggestion that the State Constitution may provide an affirmative entitlement to social welfare services not provided by the Federal Constitution. See *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 109 S. Ct 998 (1989).

---

[14]At a hearing on the question of the entry of a preliminary injunction, new evidence need be considered only as to circumstances arising since the entry of the preliminary order. Contrary to the dissent's view, the question of aversives need not be revisited before a preliminary order is entered.

[15]The motion of BRI and David's father to amend their briefs to include a claim for attorneys' fees and costs on appeal is allowed. The allowance of the motion does not imply, however, that either is entitled to an award of attorneys' fees and costs on appeal.

LIACOS, C.J. (dissenting). The court today strikes down a preliminary injunction which protected Christopher David McKnight (David), a profoundly retarded, autistic young man, from the violent consequences of his own self-destructive behavior. In so doing, the court ignores significant portions of the record, defers to an agency found to have acted in bad faith in the proceedings below, and fails to accord the findings of the Probate Court judge the deference demanded by past decisions of this court. I dissent.

1. *Facts.* I find it necessary to recite those facts not mentioned by the court regarding the actions of the Department of Mental Retardation (department) and the evidence presented at the proceedings below, which I consider crucial to a proper evaluation of the preliminary injunction.

In response to the request of David's father that the department provide services to David, the department sent a psychologist, Dr. William Packard, to evaluate David and to determine his eligibility for services. Based on Packard's report, the department made an immediate determination that David was eligible for services and that the most appropriate placement for David would be a twenty-four hour intensively staffed apartment for autistic adults. Despite this determination, the department initially proposed that David be returned to the care of his father to live in a trailer which lacked adequate heat and had no running water for part of the year. This proposal was later dropped and has been unanimously criticized by those clinicians who testified in the preliminary injunction proceedings.

After abandoning its home-care proposal, the department identified two facilities, Amego Residential Facility (Amego) and the Kennedy Donovan Program (Kennedy), as potential providers of emergency short-term services to David until a permanent placement could be arranged. A representative of the department testified that it did not consider the Behavior Research Institute, Inc. (BRI), program as an alternative to provide emergency service because BRI would want to be paid for rendering service, and because the need for short-term emergency service would not arise unless BRI had al-

ready discharged David for nonpayment, as was threatened. The Probate Court judge found that the department's rationale for not considering BRI was "illogical," "absurd," and "pure sophistry," concluding that "it is inexplicable that BRI would not even be contacted by a state agency purportedly undertaking a good faith effort to give equal consideration to providers competent to minister to [David]."

During the preliminary injunction proceedings, the department submitted to the Probate Court a document entitled "Residential Priority One Waiting List" in an effort to demonstrate that there were five "first priority" clients more in need of services than David. The department argued that an order requiring special relief for David would displace these individuals. The Probate Court judge found this document to be "deceptive and misleading" in that it did not contain "up-to-date, current, accurate information," and, contrary to statements made by the department, the document was prepared specifically for the preliminary injunction proceedings. Also, the department stated in its brief to the Probate Court that no money was available for the provision of residential services for David. In fact, the department was aware of at least $20,000 which was earmarked for David's care. The Probate Court judge found that the department had "knowingly attempted to mislead the court" through its initial assertion that no funds were available.

Five treatment facilities at which David might be placed were discussed during the preliminary injunction proceedings: (1) BRI, (2) Samoset House, (3) Amego, (4) Kennedy, and (5) South Shore Mental Health Center (South Shore). Of these five facilities, Amego and Kennedy were unable to negotiate a suitable fee arrangement with the department for the provision of services to David, and were dropped from consideration.

During the preliminary injunction proceedings, the director of the inpatient unit at South Shore, Dr. Michael Dorsey, testified that South Shore would not be an appropriate facility at which to treat David. Dr. Dorsey also testified that David would be subject to harm due to self-injury if he were

placed at Samoset House. Nevertheless, the department proposed to the Probate Court judge that David be placed at Samoset House. Assistant commissioner Jeffrey Keilson and regional director of the department Richard O'Mera, testified to the ability of Samoset House to care adequately for David. However, the Probate Court judge discounted Keilson's and O'Mera's testimony because they were administrators, not clinicians, and lacked sufficient expertise to testify to the appropriateness of a Samoset House placement for David. At the close of the preliminary injunction proceedings, the Probate Court judge found that "[n]o clinical support was provided to support [the Samoset House] placement," and that "David's placement in Samoset House, according to the unanimous clinical opinions presented to the Court, would most likely lead to a substantial increase in his self-abuse." Furthermore, the Probate Court judge found that the department's attempts to support a Samoset House placement "could have been mislead[ing]," "lack[ed] credibility," and contradicted affidavits submitted to the court by the department.

The court-appointed monitor, Dr. John Daignault, a licensed psychologist, testified that BRI had successfully treated David, and that BRI was an appropriate facility at which to place David. The executive director of BRI, Dr. Matthew Israel, also a licensed psychologist, testified to BRI's skill in treating David. Ruth Ellen Carpenter, a certified special education teacher who had known David for eleven years, testified that David had made significant progress in controlling his self-injurious behaviors during his time at BRI. In addition, a psychologist employed by the department, Dr. Packard, authored a report entered in evidence which indicated that discontinuing all aversive therapy procedures would lead to a dramatic escalation of David's self-destructive behavior.

BRI is experienced in the use of aversive therapy, while Samoset House does not utilize aversive procedures. Dr. Daignault and Dr. Israel both testified that the precipitous

removal of aversive therapy could cause David to suffer a profound regression and lead to an increase in his self-abuse.

Finally, the Probate Court judge found that local service center director Harold Berberick told David's father that BRI "is not a politically acceptable placement," and that regional director Richard O'Mera said that a BRI placement is "not the best way to win friends within the Department of Mental Retardation." In light of this evidence, the Probate Court judge concluded that the department's failure to consider BRI as an alternative treatment facility "was influenced by improper motivations, if not bad faith."

2. *The Preliminary Injunction.* The court recognizes 'that the Probate Court in this case enjoyed "broad powers to act in the best interests of David by fashioning equitable remedies," *ante* at 791, and states that "[t]he judge would have been warranted in entering an injunction (a) directing the department to provide care and protective services to David and (b) defining the level of care and protective services that the department was obligated to furnish David." *Ante* at 798. The court then narrows the remaining contested issues to whether the judge could order (1) that David remain at BRI and (2) that aversive therapy be available to prevent David from regressing.

The court, citing the well-established rule that a judge cannot order a public agency to act in a particular manner unless there is but one avenue through which that agency can fulfil its legal obligations, concludes that the record does not support a finding that only by placing David at BRI can the department fulfil its legal obligations. The court states that "[t]he injunction should have left the determination of where David is to be treated in the discretion of the department without requiring it to return to the court for approval of some other provider before David could be moved from BRI." *Ante* at 798. Similarly, the court concludes that David has not proven that "the department, acting on the judgment of qualified professionals, could not reasonably deny the continued availability and use of aversives, when necessary." *Ante* at 801. Thus, the court remands this case to the Pro-

bate Court where, presumably, another preliminary injunction hearing will be held on the need for aversives in David's treatment.

The court's reasoning and conclusions seem to me to be based on sophistry that unnecessarily prolongs these proceedings. In the circumstances of this case, the court's deference to the expertise of the department is misplaced, and its remand of the case for another hearing is unnecessary.

It is true that judicial deference to the expertise of public agencies is a vital characteristic of our constitutional government, one which invokes the principle of separation of powers contained in art. 30 of the Massachusetts Declaration of Rights. *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 480 (1983). The tradition of judicial deference to agency decision making represents an important social policy decision that public agencies are generally in a better position than courts to make particular technical decisions. However, this policy rests on an assumption that public agencies will act properly when making their decisions.

Where agencies have been shown to have acted improperly in the execution of their regulatory, statutory, or constitutional duties, this court has been willing to uphold the exercise of judicial oversight of agency functions. *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703 (1980). *Blaney* v. *Commissioner of Correction*, 374 Mass. 337 (1978).

The rule that a court will not order an agency to act in a particular way, unless there are no other methods by which the agency may fulfil its legal obligations, is drawn directly from the policy of judicial deference to agency expertise. This rule is not absolute; it gives way in the face of agency misbehavior. For example, in the case of *Bradley* v. *Commissioner of Mental Health*, 386 Mass. 363, 366 (1982), we stated that "*[a]t least until it is demonstrated that the [agency] is unable or unwilling to provide the level of security necessary for the plaintiff's confinement in some [agency] facility*, no order should be entered directing the [agency] to fulfil its statutory obligations in any particular way" (empha-

sis added). In the present case, the Probate Court judge's findings that the department acted in bad faith, knowingly misled the court, considered improper political motivations in making its decision, and failed to provide any competent clinical evidence to support its proposal to place David at Samoset House certainly warranted a conclusion that the department had abandoned its proper role in this case. Therefore, the Probate Court judge's decision to require the department to keep David at BRI did not violate the rule against improper judicial interference in agency decisions.

The judge's conclusion also finds support in the case of *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624 (1985). In that case, we did not look solely to whether there were *any* alternative avenues open to the agency; rather, we looked to the factual context of the case to determine whether there were any *feasible* alternatives which the agency might choose. *Id.* at 628, 630. "[I]t is implied in the judge's findings and in the circumstances presented that there was only one means by which the public officials could carry out their statutory duty, that is, by the construction of a seventeen story jail. The only *suitable* plan was the seventeen story proposal" (emphasis added). *Id.* at 630. "[The single justice] concluded that the only *feasible* plan in the light of costs and time was the seventeen story plan" (emphasis added). *Id.* at 628.

In the present case, the bulk of the clinical testimony presented at the preliminary injunction proceedings suggested that David would be safe at BRI. The judge, exercising his prerogative to evaluate the evidence, accepted the credibility of this expert testimony. Additionally, he accepted the clinical testimony regarding the propriety of a Samoset House placement which indicated that David would most likely regress and suffer self-inflicted injuries were he to be placed in that facility. The court fails to show that these findings were clearly erroneous.

A Probate Court's authority over matters relating to guardianship is limited to fashioning relief "in the best interest of [the person] under [its] jurisdiction." *Guardianship of*

*Anthony*, 402 Mass. 723, 726 (1988), quoting *Matter of Moe*, 385 Mass. 555, 561 (1982). "The court's power is 'to be exercised with an eye single to the welfare of the ward.' " *Guardianship of Anthony, supra* at 726, quoting *King* v. *Dolan*, 255 Mass. 236, 237 (1926). Given the fact that the other placement facilities presented as alternative placements at the preliminary injunction proceedings were either unavailable or unable to properly care for David, BRI represented the only feasible treatment facility presented to the Probate Court by any of the parties. In my opinion, the Probate Court judge was bound by his obligation of care for David's interests to order that David remain at BRI.

The court states that "[i]n legal and practical effect, the injunction is . . . permanent, not . . . preliminary." *Ante* at 792. However, by its terms, the injunction allows the department to move to vacate the injunction "at any time . . . upon the submission and upon approval by the Court of a reasonably-conceived, competently-defined clinical habilitation program sufficient to provide for Christopher David McKnight's safety, habilitation and care, and which shall not cause him harm." If the department, exercising the expertise alluded to in the court's opinion, presents a suitable treatment plan to the Probate Court, the injunction will be dissolved. I fail to see how this injunction can realistically be characterized as "permanent."

When faced with a challenge to a preliminary injunction, the task for this court is to determine whether the lower court abused its discretion in issuing the injunction. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615 (1980). *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue, ante* 701 (1990). "An appellate court's role is to decide whether the [trial] court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 615, quoting *Hochstadt* v. *Worcester Found. for Experimental Biology*, 545 F.2d 222, 229 (1st Cir. 1976). I have little doubt but that the record below provided "reasonable support" for the Probate Court judge's

finding that David risked irreparable harm if the injunction did not issue and David was subsequently removed from BRI. See *Packaging Indus. Group, Inc., supra* at 616. The testimony of at least three licensed psychologists suggested that David would risk grievous bodily harm if he were removed from BRI to Samoset House. The department presented no clinical testimony to rebut this suggestion. Quite apart from the evidence of the department's improper actions, this lack of clinical evidence to the contrary provides strong support for the judge's finding of irreparable harm.

A remand for further hearings is unnecessary. This court is not faced with a situation where the department has been unable to make its position clear or has not been allowed to present evidence in support of its position. The department has had ample opportunity to state its case. Any wrong which the department feels it suffered at the hands of the Probate Court judge arises, not out of any institutional or procedural infirmity in the proceedings below, but out of the fact that the department failed to present a professionally tenable position to the Probate Court. To remand this case to the Probate Court so that the department can now attempt to produce evidence of "accepted professional practice" to support its position, where scarce effort was made before, allows the department a second chance where none is deserved. The injunction should stand. I dissent.