ATTORNEY GENERAL *vs.* SHERIFF OF SUFFOLK COUNTY
(and a consolidated case[1]).

Suffolk. March 8, 1985. — April 18, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Mandamus. Constitutional Law*, Separation of powers, Supremacy of Federal law. *County*, Correctional facilities.

A Justice of this court had authority to order the city council of Boston to construct a seventeen story jail where the existing jail was inadequate and where the only suitable plan for construction of a new jail was a proposal for the construction of a seventeen story jail. [629-630]

The constitutional principle of separation of powers was not violated by an order of a Justice of this court requiring the city council of Boston to construct a seventeen story jail. [631]

The supremacy clause of the United States Constitution was not violated by an order of a Justice of this court requiring the construction of a seventeen story jail for Suffolk County, although some years earlier a consent decree had been entered in the United States District Court for the District of Massachusetts requiring the construction of a thirteen story jail. [632]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on October 16 and 17, 1984, respectively.

The case was heard by *Liacos*, J., and was reported by him.

*Michael Arthur Walsh (Edward H. Seksay* with him) for Boston City Council.

*Stephen S. Ostrach*, Assistant Attorney General (*Francis X. Bellotti*, Attorney General, with him) for the Attorney General.

*Chester A. Janiak (Christopher A. Duggan* with him) for Sheriff of Suffolk County.

*Max D. Stern* for the interveners.

_____

[1] Sheriff of Suffolk County *vs.* Mayor of Boston & others. Also named as defendants were the city council of Boston and the Commissioner of Correction.

*John O. Mirick,* for Hawthorne Residents Association & another, amici curiae, submitted a brief.

NOLAN, J. A single justice of this court, pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), has reported the propriety of certain orders entered by him for our hearing and determination. We affirm these orders.

The Attorney General filed a complaint in the county court in which he sought an order to compel the sheriff of Suffolk County (Sheriff) to accept into his custody all pretrial detainees committed to him by the courts of the Commonwealth. The Sheriff then brought an action by verified complaint seeking injunctive and declaratory relief against the mayor of Boston (Mayor), the city council of Boston (City Council), and the Commissioner of Correction. The Sheriff sought to enjoin the Mayor and City Council from failing to provide funding for facilities to house Suffolk County pretrial detainees, to enjoin the Commissioner of Correction from refusing to accept Suffolk County pretrial detainees, and to declare the obligation of the Mayor and City Council to provide suitable facilities for pretrial detainees who cannot be accommodated at the Charles Street jail (jail). These two actions were consolidated and the detainees at the jail and the inmates at the Deer Island house of correction were permitted to intervene.[2] The City Council filed a motion to dismiss the complaint against it and the motion was denied.

The problem is overcrowding at the jail, which has suffered malignant neglect for many years.

*The Federal action.* As long ago as 1973, the inmates[3] of the jail brought an action in the United States District Court for the District of Massachusetts claiming a deprivation of their

[2] Subsequently, the inmates at the Deer Island house of correction brought a third-party complaint against the Attorney General, the Commissioner of Correction, the Sheriff, the Mayor, the City Council, and the penal commissioner of Boston. This action has been severed.

On this appeal, we acknowledge the amici curiae brief filed by the Hawthorne Residents Association and Charles River Park, Inc.

[3] The term "inmate" has been used generally to describe any person held at the jail, whereas a detainee is one who is held only while awaiting trial. The terms are used interchangeably in this opinion.

rights to due process because of the housing conditions at the jail. *Inmates of the Suffolk County Jail* v. *Eisenstadt*, 360 F. Supp. 676 (D. Mass. 1973). A judge of that court entered a detailed judgment covering many subjects such as single cell occupancy, clothing, medical examinations of inmates, and recreation time. The judgment permanently enjoined the defendants from housing in the jail any inmate awaiting trial after June 30, 1976. *Id.* at 691. That judgment was not appealed. The United States District Court postponed the operative date from June 30, 1976, to July 1, 1977, then to November 1, 1977. At the request of the City Council, a further stay was granted by the United States Court of Appeals for the First Circuit to March 3, 1978. A final stay of the order barring the housing of inmates at the jail was allowed until October 2, 1978. The order was then to become effective unless the parties reached a definite agreement on a site, construction schedule, and design plans for a replacement of the present jail. *Inmates of the Suffolk County Jail* v. *Kearney*, 573 F.2d 98, 100-101 (1st Cir. 1978).

In April, 1979, all parties in the Federal litigation signed a consent decree which required the continued housing of inmates on a one inmate to one cell basis. The consent decree called for construction on the present site and contained detailed specifications for construction, which was to begin in 86 weeks (by the end of 1980) and be completed by 1983. The consent decree plan recommended a population of 272 men and 18 women to be housed in "modules."

The original projections of the anticipated jail population was 238 inmates in 1983, which figure would decline in later years. A safety margin of 34 spaces was provided. However, by 1982, the architectural plans were modified to provide a maximum capacity of 309 inmates.

These projections have proved inaccurate because the jail population has continued to increase, as will be demonstrated later. The Sheriff responded to this problem of overcrowding by transferring detainees to jails in other counties with the cooperation of sheriffs in those counties and by transferring those detainees who had previously served sentences for felo-

nies in State institutions to the custody of the Commissioner of Correction under G. L. c. 276, § 52A. By October, 1984, even these stop-gap measures proved inadequate because the entire correctional system was sagging under the weight of overcrowding.

*The proceeding before the single justice.* When the breaking point was reached in October, 1984, the Attorney General filed his complaint against the Sheriff, which was followed by the Sheriff's complaint against the Mayor, the City Council, and the Commissioner of Correction. The single justice conducted a number of hearings at which he consistently pressed the parties for agreement on as many issues as possible. Finally, all parties and interveners agreed in a stipulation on the following: (1) a new jail was necessary; (2) its site should be the site of the present jail; (3) a jail of 435 cells was required; (4) the new jail should contain at least a thirteen story highrise component.

The parties stipulated that the city of Boston has already appropriated $15.4 million and the Attorney General and the Commissioner of Correction will support State funding of $28 million to construct a seventeen story jail. The City Council opposes the seventeen story structure and has espoused a plan calling for a thirteen story structure and rehabilitation of at least part of the existing jail in order to accommodate 435 cells. All the parties (the Attorney General, Commissioner, Mayor, inmates) except the City Council favor the seventeen story plan though the Sheriff would be content with either plan as long as there were 435 cells. All parties agree that any plan which differs from that approved in the consent decree must be submitted to the Federal court for approval.

The seventeen story plan has distinct advantages over the thirteen story plan. The estimated cost of the seventeen story structure is $43 million, compared to $37 million for the thirteen story structure in addition to $20 million for rehabilitation of the existing jail, which is required if only a thirteen story structure is built. Officials of the public facilities department of Boston (PFD) said that plans for the seventeen story structure need not be submitted for review to the division of capital

planning and outlay (DCPO), whereas plans for the rehabilitation of the existing jail, which is part of the thirteen story plan, would require submission to DCPO for review and approval. This submission and approval, it is estimated, would cause a delay of approximately two years.

The single justice made the following findings of fact, which are entirely consistent with those facts on which the parties agreed by stipulation.[4] He found that the thirteen story jail indicated in the consent decree plan would house 309 detainees and that this plan is no longer adequate. The average daily count of detainees housed at the jail has increased steadily since 1980 as the following chart shows:

| | |
|---|---|
| 1980 | 190 |
| 1981 | 227 |
| 1982 | 281 |
| 1983 | 300 |
| 1984 (through November 20th) | 320 |

The present site would not have been the choice of the single justice (nor would it be our choice) but he adopted it because all the parties agreed to it.

He concluded that the only feasible plan in the light of costs and time was the seventeen story plan and he ordered that the thirteen story plan "be modified to include the addition of four more stories." He ordered the plaintiffs in the Federal litigation to "file any necessary documents or motions with the Federal Court seeking such modification of Federal orders as may be necessary." He ordered the following timetable to be observed:

---

[4] This opinion deliberately omits discussion of the merits of an interim jail, use of the "Plant" at the Deer Island house of correction as a temporary jail, and the single justice's order regarding bail reviews because these issues have not been raised on appeal.

| "ACTIVITY | DURATION | COMPLETION DATE |
|---|---|---|
| a. Modification of plans | 3 months | April 21, 1985 |
| b. Value Eng. Review | 6 weeks | June 3, 1985 |
| c. Complete all details | 2 months | Aug. 3, 1985 |
| d. Review by all parties | 1 month | Sept. 3, 1985 |
| e. Incorporate final comments | 1 month | Oct. 3, 1985 |
| f. Bid process | 2 months | Dec. 3, 1985" |

On appeal, the City Council challenges the validity of the single justice's orders on the grounds (1) that an action in the nature of mandamus does not lie against the City Council, (2) that the orders violate art. 30 of the Declaration of Rights of the Massachusetts Constitution, and (3) that they violate art. 6 of the United States Constitution. We shall treat them in this order.

1. *Limitations on mandamus.*[5] The City Council argues that the single justice has no power to order it to construct a seventeen story jail because such an order invades the City Council's discretionary powers and mandamus does not lie in such cases. The argument is without merit. The obligation of the City Council to provide a suitable jail is not discretionary.

The starting point of any discussion of the court's power to order city officials to construct a jail is G. L. c. 34, § 3, which orders each county to provide suitable jails for its use.[6] The court from earliest days has exercised its judicial power to compel public officials to do their duty. As early as 1824, the Supreme Judicial Court granted the writ of mandamus against the Justices of the Court of Sessions, ordering them to comply with the statute (St. 1787, c. 54, § 1) that required the erection of a house of correction. *Commonwealth* v. *Court of Sessions*

---

[5] For convenience, we use the term mandamus, instead of action in the nature of mandamus, though mindful of the abolition of the writ of mandamus by Mass. R. Civ. P. 81(b), 365 Mass. 841 (1974).

[6] General Laws c. 34, § 3, as amended through St. 1978, c. 478, § 17, provides in pertinent part: "Each county shall provide suitable jails, houses of correction, fireproof offices and other public buildings necessary for its use except that the county of Dukes need not provide a house of correction, and that Boston shall provide necessary public buildings for Suffolk county."

*of Hampden*, 2 Pick. 414 (1824). In 1943 the court ordered the town of Hudson to chlorinate its water supply. *Commonwealth* v. *Hudson*, 315 Mass. 335 (1943). The court imposed a receivership on the Boston Housing Authority in *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703 (1980), because the defendant had failed to operate the authority "as the Legislature declared it should be." *Id.* at 742. A year later, the court sustained a single justice's order restraining the Suffolk County Court House Commission, among others, from reducing the existing level of services at the Suffolk County Court House. *Commonwealth* v. *County of Suffolk*, 383 Mass. 286 (1981). Therefore, the power of the single justice to compel city officials to comply with law is beyond dispute.

In this case, of course, the single justice has done more than simply order the city officials to comply with their statutory duties. He has directed that they carry out those duties in a specific way. Normally, as we have said, courts may properly direct a public official to carry out a statutory duty, but, where the means of carrying out that statutory duty is within the discretion of the public official, courts normally will not direct how the public official should exercise that statutory duty. Here, however, it is implied in the judge's findings and in the circumstances presented that there was only one means by which the public officials could carry out their statutory duty, that is, by the construction of a seventeen story jail.

The only suitable plan was the seventeen story proposal. The thirteen story proposal required a rehabilitation of the existing jail, which required the expenditure of $20 million for which no provision had been made. In contrast, the seventeen story plan could be accomplished with the $15.4 million already set aside by the city and $28 million of expected State funds. In addition, the thirteen story plan would require submission of plans to DCPO, which would entail an additional two-year delay. In light of the scandalous delay already suffered in providing a suitable jail for Suffolk County, the additional two-year delay alone would be sufficient to render the thirteen story plan wholly unrealistic. In a word, there was only one plan which could be adopted within the financial and time frame available and this was the seventeen story plan.

2. *Article 30 of the Massachusetts Declaration of Rights.* The City Council argues that the single justice's orders violate the principle of separation of powers contained in art. 30 of the Massachusetts Declaration of Rights to the extent that the judicial orders are an improper exercise of political and nonjusticiable power. See *Coleman* v. *Miller*, 307 U.S. 433, 454-455 (1939). The orders represent, it is claimed, a poaching by the judicial branch on executive and legislative territories.

The orders are designed to carry out a purely judicial function, i.e., ordering the fulfilment of the statutory obligation of the city of Boston to provide a suitable jail under the mandate of G. L. c. 34, § 3. It falls to the judicial branch to insure compliance with this statute. The court must have power to carry out its obligation. See *Commonwealth* v. *Hudson*, 315 Mass. 335, 346 (1943).

An argument similar to the City Council's was made by the defendant in *Perez* v. *Boston Hous. Auth.*, *supra*, wherein this court affirmed the action of a Superior Court judge in placing the Boston Housing Authority in temporary receivership. The language of *Perez* is most apposite to the instant case: "But if it is a function of the judicial branch to provide remedies for violations of law, including violations committed by the executive branch, then an injunction with that intent does not derogate from the separation principle, nor, by extension, does a receivership otherwise properly instituted. To the contrary, when the executive persists in indifference to, or neglect or disobedience of court orders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle." *Id.* at 739-740. The same principle can be applied to the City Council. Courts have traditionally issued orders and injunctions directing public officials to carry out their obligations. See *Blaney* v. *Commissioner of Correction*, 374 Mass. 337, 342 (1978).

What is more, even if art. 30 did bear upon the orders, it must be remembered that the City Council's failure to construct a suitable jail in which to house detainees committed by the courts may interfere with the functioning of the judicial branch, which is charged with committing persons to the jail.

3. *Article 6 of the United States Constitution.* The City Council argues that art. 6 of the United States Constitution, popularly known as the supremacy clause, prohibits this court from treating the subject matter of the construction of the jail because the Federal court has spoken in the consent decree and, in terms of art. 6, such consent decree is the supreme law of the land.

At the outset, the question whether a judgment or decree of a United States District Court is within the supremacy clause is by no means settled. It is doubtful that decisions of any Federal court except the decisions of the United States Supreme Court are conclusive on State courts. See *United States* v. *Woods,* 432 F.2d 1072, 1075-1076 (7th Cir. 1970); *Commonwealth* v. *Montanez,* 388 Mass. 603, 604 (1983); *State* v. *McKay,* 680 S.W.2d 447, 450 (Tenn. 1984); *Kraus* v. *Board of Education of Jennings,* 492 S.W. 783, 784 (Mo. 1973). Further, even if the supremacy clause were in point, it may be argued that the City Council should not be heard to claim the shield of art. 6 because it has consistently failed to discharge its obligation under the Federal consent decree.

In truth, the difference between the orders of the single justice and the provisions of the consent decree is miniscule, i.e., seventeen stories as contrasted with thirteen stories. The construction of seventeen stories would not conflict with the order for thirteen stories. The single justice's orders achieve the goal that the consent decree sought, but is no longer able, to achieve. This is hardly the species of confrontation covered by the supremacy clause, even if art. 6 is properly invocable. There is no real conflict between the Federal consent decree and the orders of the single justice.

The orders of the single justice are affirmed.

*So ordered.*