## Commonwealth *vs.* Edward Donohue.

Middlesex. May 5, 2008. - August 22, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Sheriff. Constitutional Law,* Separation of powers. *Practice, Criminal,* Sentence. *Statute,* Construction.

A sheriff's release from confinement in a house of correction of select inmates who had not fully served the committed portions of their sentences, pursuant to a program in which the sheriff placed in home confinement inmates who met certain criteria and supervised them by means of, inter alia, global position satellite monitoring bracelets, did not impermissibly intrude on the core judicial function of sentencing in violation of art. 30 of the Massachusetts Declaration of Rights and did not constitute an ultra vires act on the part of the sheriff, where G. L. c. 127, §§ 48, 49, and 49A, provided specific legislative authorization for such a program. [264-269] Cowin, J., dissenting.

Indictment found and returned in the Superior Court Department on May 23, 2006.

Orders directing sheriff to confine defendant and certain other committed offenders were entered by *Diane M. Kottmyer,* J., and motions for reconsideration and for a stay were considered by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas Drechsler,* Special Assistant Attorney General (*Steven J. Masse* with him) for sheriff of Middlesex County.

*Randall E. Ravitz,* Assistant Attorney General, for Superior Court Department of the Trial Court.

*Edward J. McDonough, Jr., & Thomas E. Day* for sheriff of Hampden County & others, amici curiae, submitted a brief.

*Beth L. Eisenberg,* Committee for Public Counsel Services, *Lauren Petit, & Lee J. Gartenberg,* for Committee for Public Counsel Services & others, amici curiae, submitted a brief.

Spina, J. At issue in this case is whether the use of Policy and

Procedure 467, also known as the "Global Position Satellite Monitoring Program" (GPS program), by the Middlesex County sheriff's office (sheriff), violates art. 30 of the Massachusetts Declaration of Rights insofar as it allows the sheriff to release from the Billerica house of correction (house of correction) and place in home confinement select inmates who have not fully served the "committed" portions of their sentences. For the reasons that follow, we conclude that the placement of select inmates in the GPS program does not violate art. 30 and does not constitute an ultra vires act by the sheriff.

1. *The GPS program.*[1] By way of background, we begin with a brief overview of Policy and Procedure 467,[2] which is a policy of the Middlesex County sheriff's office.[3] See Policy and Procedure 467.04 (2007). The GPS program is "designed to promote reintegration and to test the readiness of inmates for release by maximizing an inmate's time in the community prior to his actual parole or discharge. The program allows an inmate to demonstrate his competence in a realistic living environment while monitored under strict conditions of accountability." Policy and Procedure 467.03. When determining an inmate's suitability for the GPS program, consideration will be given to the "inmate's record, including institutional behavior, community release record, demonstrated ability to conform to rules and regulations, length of time served and participation in programs." Policy and Procedure 467.05(4). Eligible inmates shall meet the following criteria: (a) "current minimum security or pre-release status"; (b) "no substance abuse related disciplinary infractions"; (c) "good overall institutional record and satisfactory evaluations"; (d) "any charge prohibited by state statute";[4] (e) "no outstanding warrants, pending cases, active restraining orders or CORI A notifications";

[1]The predecessor to the GPS program, known as the "day reporting system," was first implemented by the sheriff in 1988. For a discussion of the expansion of the day reporting system, see note 12, *infra.*

[2]Policy and Procedure 467 has been revised since the October 1, 2007, order of the Superior Court. None of the changes affects this appeal.

[3]Policy and Procedure 467 states that it is consistent with 103 Code Mass. Regs. § 952.01 (1999), a regulation promulgated by the Department of Correction that relates to "community release programs," operated by county correctional facilities. See Policy and Procedure 467.02 (2007).

[4]The meaning of this particular criterion is unclear from the language of Policy and Procedure 467.05.

and (f) "not considered a risk to public safety." *Id.* Certain conditions render an inmate ineligible for the GPS program, including commitment on an escape charge or a prior escape, a mandatory sentence, an offense of domestic violence, or being the subject of an active protective order. See Policy and Procedure 467.05(3).

Every inmate participating in the GPS program shall be required to wear a tamper-proof transmitter, which enables the sheriff's staff to monitor the inmate twenty-four hours each day, and shall be required to have, among other things, an approved home and work plan and a reliable means of transportation, either private or public. See Policy and Procedure 467.06, 467.09(1). Each inmate's activities are supervised by a GPS monitoring officer who approves the inmate's itinerary and any changes thereto, and who conducts random checks on the inmate, both by telephone and by onsite visits. See Policy and Procedure 467.09(2), 467.09(4). All inmates participating in the GPS program shall be supervised for "out of place" violations and for the use of alcohol and illegal drugs, and they shall be required to submit to random and frequent "urine surveillance." See Policy and Procedure 467.09(5).

Inmates must report to the house of correction in person as scheduled or whenever so ordered, at which time they are required to submit, for approval, their itineraries for the following week. See Policy and Procedure 467.09(6). Inmates also must agree to abide by the rules of conduct of the GPS program, and they are required to read and sign an agreement that specifies those rules. See Policy and Procedure 467.08(1). A disciplinary report may be issued whenever there is an infraction of any rule of conduct, and if such a report is issued, the inmate shall be returned to the house of correction and be placed in administrative segregation pending a hearing. See Policy and Procedure 467.08(2), (3). The GPS program provides that an inmate will be declared to have escaped if that inmate fails to report to a designated destination within two hours of his established time, if the designated administrator believes that the inmate has escaped, or if there is confirmation that the inmate has destroyed or otherwise rendered inoperable the GPS monitoring equipment. See Policy and Procedure 467.11(1). In addition to escape, an inmate can be terminated from the GPS program for, among other reasons, a new

arrest, a new case, a positive urine screening, a violation of the rules of conduct, or a reclassification.[5] See Policy and Procedure 467.10.

2. *Background.* On March 8, 2007, following a jury trial, Edward Donohue was found guilty of operating a motor vehicle while under the influence of alcohol, third offense, in violation of G. L. c. 90, § 24.[6] On March 20, 2007, he was sentenced to a term of two and one-half years in the house of correction,[7] with eighteen months to be served and the balance to be suspended for four years, and he was given credit for thirteen days of time

[5]In a letter dated December 17, 2007, the Secretary of the Executive Office of Public Safety (Secretary) informed the sheriff that, in light of the current litigation challenging the GPS program, he had reviewed the use of electronic monitoring programs by county sheriffs' departments throughout Massachusetts. The Secretary told the sheriff that the Middlesex County sheriff's office is one of at least seven sheriffs' offices that uses and relies on a home confinement program. The Secretary stated that, "[a]lthough the details of the programs vary, there are some consistent practices from county to county." He pointed out that each program "has strict procedures for classification and participation," with "public safety being an utmost concern," and that the programs "require much more than electronic monitoring." The Secretary further stated that a home confinement program, as an alternative to institutional incarceration, "is an effective tool for the successful re-entry of inmates into the community while minimizing the public safety concerns associated with overcrowding in prisons and releasing inmates who are not prepared to reintegrate into society." In the Secretary's view, the discontinuation of electronic monitoring programs could be devastating to overcrowding problems and to societal reentry efforts. This December 17, 2007, letter from the Secretary was not part of the record on appeal, but the Attorney General assented to its inclusion in the appendix to the sheriff's brief.

[6]General Laws c. 90, § 24 (1) (*a*) (1), states that for a conviction of operating a motor vehicle while under the influence of alcohol, third offense, "the defendant shall be punished by . . . imprisonment for not less than one hundred and eighty days nor more than two and one-half years or by . . . imprisonment in the state prison for not less than two and one-half years nor more than five years; provided, however, that the sentence imposed upon such person shall not be reduced to less than one hundred and fifty days, nor suspended, nor shall any such person be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one hundred and fifty days of such sentence . . . ."

[7]A "correctional facility" is statutorily defined as "any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law." G. L. c. 125, § 1 (*d*). A "committed offender" is "a person convicted of a crime and committed, under sentence, to a correctional facility." G. L. c. 125, § 1 (*c*).

served.[8] On September 17, 2007, after Donohue had served 195 days of his sentence, the sheriff transferred him, pursuant to Policy and Procedure 467, from the physical confines of the house of correction to the confines of Donohue's home with a GPS monitoring bracelet. Donohue worked from his house for a mortgage company, and he was permitted to leave for scheduled appointments with appropriate permission. In addition, Donohue was required to attend five Alcoholics Anonymous and Narcotics Anonymous meetings a week, attend a weekly class at the community counseling center, and perform weekly community service.

On September 19, 2007, Donohue's case was placed on the Superior Court's hearing list for a determination of indigency because he had requested the appointment of counsel to appeal from his conviction. The court issued a writ of habeas corpus to the house of correction for Donohue to appear in the Superior Court in Middlesex County for a hearing. Donohue arrived in court accompanied by a deputy sheriff, and the judge learned that Donohue had been released from the house of correction on a GPS monitoring bracelet. On September 20, 2007, the judge issued an order for the sheriff to show cause why Donohue was not serving the sentence that had been imposed by the court on March 20. The sheriff filed an opposition to the court's order, claiming that it constituted judicial interference with his authority to determine the manner by which defendants serve their sentences in violation of the separation of powers principles expressed in art. 30 of the Massachusetts Declaration of Rights.[9]

At the show cause hearing on September 21, 2007, the sheriff took the position that he had the authority to confine Donohue

---

[8]The mittimus directed, in pertinent part, as follows: "We therefore COMMAND YOU, The said Sheriffs and Deputies to remove the said Edward Donohue to said House of Correction, Billerica and we command you, the Master of said House of Correction Billerica to receive[] the said Edward Donohue and the said Edward Donohue to imprison and employ in an[d] within the precincts of said House of Correction Billerica for and during the time of 2½ [years] — 18 months to be served[,] balance suspended for 4 years."

[9]Article 30 of the Massachusetts Declaration of Rights provides: "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

in his personal residence with an electronic bracelet, notwithstanding the fact that Donohue had not finished serving the "committed" portion of his sentence. The judge advised the sheriff that he did not have statutory authority to declare the personal residence of a defendant under sentence to the house of correction to be "a place of confinement" and that he was in violation of the mittimus. The judge ordered the sheriff to confine Donohue "in the House of Correction, Billerica, pending disposition of this matter, except to the extent that G. L. c. 127, §§ 48, 49 and 86F[,] expressly authorize the Sheriff to release [Donohue] 'during necessary and reasonable hours' for the purposes set forth in those statutes." The sheriff complied with this order.

A further hearing on the matter was held on September 27, 2007. At this proceeding, the sheriff confirmed that Donohue's earliest release date on parole, after application of all statutory credits, would be November 27, 2007. The sheriff further stated that, at any given time, ten to fifteen inmates under sentence to the house of correction were "classified" to the GPS program and, therefore, were not being housed in a facility maintained by the sheriff.

On October 2, 2007, the judge issued a memorandum of decision and order in which she found that, to the extent Policy and Procedure 467 authorized the release from custody of committed offenders who had not completed their sentences as imposed by a court, it impermissibly intruded on the core judicial function of sentencing in violation of art. 30.[10] Based on her review of the applicable statutes and regulations, the judge stated that the sheriff

---

[10] In her decision, the judge noted that the sheriff had questioned the court's authority, in the first instance, to issue the September 20 order to show cause and the September 21 order of confinement, in light of the fact that judgment already had entered in Donohue's criminal case and there was no actual controversy before the judge. The judge wrote that "there is no doubt that the ability to enter orders is necessary to the very existence of the court and essential to the maintenance of the court's authority," quoting *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1)*, 424 Mass. 430, 447 (1997). See *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 631 (1985) ("Courts have traditionally issued orders and injunctions directing public officials to carry out their obligations"). Further, she continued, because the court's inherent judicial powers "have their basis in the Constitution, regardless of any statute, every judge must exercise his inherent powers as necessary to secure the full and effective administration of justice," *Querubin* v. *Commonwealth*, 440 Mass. 108, 115 (2003). The judge

was required to house committed offenders in a correctional facility, which, in appropriate circumstances, could be a community release facility.[11] However, the judge continued, Donohue's personal residence was neither a "correctional facility," as defined in G. L. c. 125, § 1 (*d*), nor a "community release facility," as defined in 103 Code Mass. Regs. § 902.01 (1999). Therefore, the judge concluded that, to the extent the GPS program permitted a committed offender who had not served the committed portion of his sentence to be housed outside of a correctional facility, the GPS program was in direct conflict with statutory provisions governing the execution of sentences, work and education release, and furloughs. Relying on *Commonwealth* v. *Morasse*, 446 Mass. 113, 120 (2006), the judge pointed out that confinement to one's home with an electronic bracelet is not the functional equivalent of being incarcerated. In the exercise of the court's inherent power to enforce its judgments, the judge ordered the sheriff to (1) keep Donohue in custody in the house of correction until he shall have served the sentence imposed by the court, except to the extent that G. L. c. 127, §§ 48, 49, and 86F, expressly authorize the sheriff to release Donohue "during necessary and reasonable hours" for the purposes set forth therein; and (2) return to custody in the house of correction any other committed offender sentenced by a judge of the Superior Court who

stated that the imposition of a sentence in a criminal case is "a core judicial function." *United States* v. *Johnson*, 48 F.3d 806, 808 (4th Cir. 1995), citing *Ex parte United States, petitioner*, 242 U.S. 27, 41 (1916). As such, the judge concluded that, under established law, the court had the authority to issue orders necessary to enforce the sentence entered as a final judgment in this case. Cf. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 20 (1923) ("Doubtless the court has power to enforce the execution of sentence by appropriate process, but execution of sentence is in its essence an executive or ministerial and not a judicial function"). The sheriff has conceded that a court has the authority to order the Middlesex County sheriff's office to perform its legal obligations. See *Attorney Gen.* v. *Sheriff of Suffolk County*, *supra* at 629. Because we agree with the judge's jurisdictional analysis, we need not review this particular aspect of the case in further detail.

[11]A "[c]ommunity release facility" is defined as "[a] correctional facility that provides housing and programming for participants of Work Release, Pre-Release or Alcohol Treatment Programs." 103 Code Mass. Regs. § 902.01 (1999). Cf. note 7, *supra*. The term "[w]ork release" is defined as "[a] formal arrangement sanctioned by [G. L.] c. 127, §§ 48, 49, 49A, and 86F[,] whereby an inmate is permitted to maintain approved and regular employment in the community." 103 Code Mass. Regs. § 902.01.

has not served the sentence imposed by the court, but has been released pursuant to the GPS program.

On October 4, 2007, the sheriff filed a notice of appeal, as well as a motion for reconsideration of the October 2 order and a motion to stay the order pending appeal. On November 9, 2007, the same Superior Court judge denied the sheriff's motions for reconsideration and for a stay.[12] The sheriff filed a notice of appeal from that determination, and both appeals were consolidated by the Appeals Court. We transferred the case here on our own motion and now reverse in part and vacate in part the October 2, 2007, order of the Superior Court.[13]

---

[12]The basis of the sheriff's motion for reconsideration was his contention that the judge's October 2, 2007, order conflicted with past orders of the Superior Court. More specifically, in March, 1989, two inmates of the house of correction filed a class action lawsuit in the Superior Court seeking to ameliorate the overcrowded conditions of their confinement which, they alleged, violated their rights under the Fifth and Eighth Amendments to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights (cruel or unusual punishment). The plaintiffs also sought a declaration that various conditions at the house of correction violated the equal protection clause of the Fourteenth Amendment to the United States Constitution. As a preliminary matter, the plaintiffs sought injunctive relief. In his memorandum and order entered April 30, 1990, a judge in the Superior Court stated that the plaintiffs did not satisfy all of the necessary requirements for preliminary relief. Nonetheless, he concluded that the plaintiffs did establish a substantial likelihood of success on the merits and a showing of irreparable harm with respect to many of their allegations. Consequently, as part of his order, the judge directed the sheriff to "use his best efforts to enlarge the use of the day reporting system." Subsequently, a memorandum of understanding dated October 1, 1993, was entered by a different judge in the Superior Court in accordance with the April 30, 1990, determination. It reiterated that "[t]he sheriff will continue to use his best efforts to enlarge the use of the day reporting program." The memorandum also provided that it "shall not be interpreted to restrict, supersede, or otherwise alter the constitutional, statutory or regulatory responsibilities of any of the defendants named in this action." The judge construed this memorandum of understanding as an agreement for judgment, and he stated that, for all purposes, it would constitute the final judgment in the case. See Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977). See also Ansara v. Regan, 276 Mass. 586, 589 (1931) (parties to agreement for judgment are "bound by the legal effect of the judgment as if it were the outcome which a court would have reached had the issues disclosed by the pleadings been fully tried and decided"). As to the applicability of this agreement for judgment to the present case, the judge here concluded that the sheriff's argument that such judgment gave the sheriff the authority to release committed inmates in violation of his constitutional and statutory responsibilities was without merit. The 1993 agreement for judgment is not determinative of the appeal now before us.

[13]Donohue did not file a brief in this appeal or participate in oral argument.

3. *Discussion.* "A sentencing judge is given great discretion in determining a proper sentence." *Commonwealth* v. *Lykus,* 406 Mass. 135, 145 (1989). The judge has the authority to decide the length of a defendant's sentence, provided that it is within the limits set forth by the statute under which the defendant has been convicted. See *id.* See also *Commonwealth* v. *Power,* 420 Mass. 410, 413 (1995), cert. denied, 516 U.S. 1042 (1996). Further, in the exercise of her sentencing discretion, the judge may consider a variety of factors including the defendant's behavior, family life, employment history, and civic contributions, as well as societal goals of "punishment, deterrence, protection of the public, and rehabilitation." *Id.* at 414. See *Commonwealth* v. *Celeste,* 358 Mass. 307, 310 (1970); *Commonwealth* v. *Ferguson,* 30 Mass. App. Ct. 580, 586 (1991).

Generally, however, once a judge has sentenced a defendant, authority over the defendant passes from the judicial branch to the executive branch of government in that the defendant becomes subject to the sheriff's control.[14] The Legislature has conferred on the sheriff broad authority over the house of correction. General Laws c. 126, § 16, states that "[t]he sheriff shall have custody and control of the jails in his county, and, except in Suffolk County, of the houses of correction therein, and of all prisoners committed thereto . . . and shall be responsible for them." See *Sheehan, petitioner,* 254 Mass. 342, 345 (1926) ("The execution of sentences according to standing laws is an attribute of the executive department of government"); *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 20 (1923) ("The execution of the sentence belongs to the executive department of government" and is not "a judicial function").

Referring to these principles, the sheriff contends that, once a defendant has been sentenced to the house of correction, the sheriff has the authority under art. 30 to set the conditions of an inmate's incarceration as the sheriff deems appropriate, subject to any mandatory sentence requirements or other restrictions

We acknowledge the amicus brief filed by the Committee for Public Counsel Services, Massachusetts Correctional Legal Services, and Inmate Legal Services for the Middlesex County Sheriff, and the amicus brief filed by thirteen Massachusetts sheriffs and the Massachusetts Sheriffs Association.

[14]The office of sheriff is part of the executive branch of State government. See *Opinion of the Justices,* 353 Mass. 801, 802 (1968).

imposed by the Legislature. Here, the sheriff continues, it was appropriate to assign Donohue to the GPS program, a program that has continued uninterrupted for nearly twenty years, after Donohue had served 195 days within the physical confines of the house of correction. The sheriff argues that this type of confinement has not been prohibited by the Legislature. Moreover, he asserts that the judge took an overly restrictive view of the statutory framework governing the sheriff's authority to manage the inmates under his control.

We are not required to resolve in this case whether the sheriff is correct that art. 30, or his broad statutory authority to determine the place of confinement of inmates within his custody and control, permits him generally to "confine" an inmate in his home before the inmate has served the committed portion of his sentence at the house of correction or other correctional facility. We reach this conclusion because, in our view, G. L. c. 127, §§ 48, 49, and 49A, provide specific legislative authorization for the GPS program and for the placement of Donohue, or similarly situated inmates, in it.

The Legislature has mandated that administrators of county correctional facilities establish and maintain education, training, and employment programs for persons committed to these facilities. See G. L. c. 127, § 48. "Such programs shall include opportunities for academic education, vocational education, vocational training, other related prevocational programs and employment, and may be made available within correctional facilities or, subject to the restrictions set forth in [§§ 49 and 86F], at other places approved by the commissioner [of correction] or administrator." *Id.* General Laws c. 127, § 49, provides that "the administrator of a county correctional facility, subject to rules and regulations established in accordance with the provisions of this section, may permit an inmate who has served such a portion of his sentence or sentences that he would be eligible for parole within eighteen months to participate in education, training, or employment programs established under [§ 48] outside a correctional facility," subject to several inmate eligibility restrictions not relevant here. Section 49 further states that the administrator of a county correctional facility "shall make and promulgate rules and regulations regarding programs established

under [§ 48] outside correctional facilities. Such rules and regulations shall include provisions for reasonable periods of confinement to particular correctional facilities before a committed offender may be permitted to participate in such programs and provisions for feeding, housing and supervising participants in such programs in such manner as will be calculated to maintain morale and prevent the introduction of contraband to the facility." Certainly education, training, and employment programs that house qualified inmates in their own homes, designed to allow a gradual, but supervised, reintegration into society, strictly monitored by a GPS bracelet, would foster morale and prevent the introduction of contraband into the correctional facility.

Because Donohue had served 195 days of his sentence in the house of correction at the time he was admitted into the GPS program, he had satisfied the legislative requirement, set forth in G. L. c. 90, § 24 (1) (a) (1), that he serve at least 150 days before being eligible for parole. Moreover, he was well within eighteen months of being parole eligible, a requirement established by G. L. c. 127, § 49, for participation in the types of programs authorized by G. L. c. 127, § 48.[15] Having served even more than the legislatively prescribed minimum period of incarceration, it is clear that Donohue had served what might be deemed a "reasonable period[] of confinement" under G. L. c. 127, § 49, before he was permitted to participate in the GPS program. Nothing set forth in § 49 restricts the sheriff's ability to place an inmate in home confinement with a GPS monitoring bracelet as part of the inmate's participation in education, training, or employment programs, established under § 48, outside the house of correction. To the contrary, the statutory scheme suggests a legislative intent to allow this kind of arrangement.[16] We point out that "where two or more statutes relate to the same subject matter, they should be construed together so as

---

[15]Based on the judge's order that Donohue serve eighteen months of his sentence of two and one-half years, he would be eligible for parole once he served one-half of the committed portion of his sentence, or nine months. See 120 Code Mass. Regs. § 200.02(1) (2003).

[16]Contrary to the position advocated by the dissent, we do not construe the language of G. L. c. 127, § 49, to mean that a committed offender must be confined to a particular correctional facility *during* the time that the offender is participating in education, training, or employment programs established

to constitute a harmonious whole consistent with the legislative purpose." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975). General Laws c. 127, § 49A, states that "[b]efore any inmate may be considered for participation in education, training, or employment programs established under [§ 48] outside a correctional facility, *or in any other program outside a correctional facility exclusive of parole*, he shall first demonstrate that he is responsible and deserving of these opportunities" (emphasis added). This language reinforces our interpretation of the statutory scheme as one where the Legislature has conferred on the sheriff the authority and discretion to implement a variety of inmate programs outside a correctional facility, designed to foster skills that will be necessary for societal reintegration prior to the inmate's actual release, because prison officials are in the best position to perform this function.[17]

The parameters of some programs are described with particularity by the Legislature. One such program is a "work release program." General Laws c. 127, § 86F, states that "[t]he sheriff o[f] any county, except the sheriff of Suffolk county, may establish a work release program under which persons sentenced to the house of correction, except sex offenders, may be granted the privilege of leaving actual confinement during necessary and reasonable hours for the purpose of working at gainful employ-

under G. L. c. 127, § 48, outside a correctional facility. The language of § 49 only states that regulations pertaining to these programs "shall include provisions for reasonable periods of confinement to particular correctional facilities *before* a committed offender may be permitted to participate in such programs" (emphasis added). In other words, a committed offender will be required to spend some time inside a house of correction before that offender will be considered for participation in a program outside the correctional facility. Otherwise, a defendant ordered to serve, for example, a sentence of two and one-half years would be immediately eligible for participation in such programs because he is eligible for parole within fifteen months. The dissent's interpretation of § 49 is inconsistent with our reading of the statutory scheme as a whole.

[17]We note that "[i]n the case of a committed offender who participates in *any* program outside a correctional facility established under [§ 48], the time spent in such participation shall be credited toward the serving of his sentence in the same manner as though he had served such time within the facility" (emphasis added). G. L. c. 127, § 49. Contrast *Commonwealth* v. *Morasse*, 446 Mass. 113, 120-121 (2006) (recognizing that pretrial confinement to one's home with electronic bracelet is not equivalent of being incarcerated and does not qualify for sentencing credit).

ment within the commonwealth."[18] The work release programs delineated in § 86F require that participating inmates "shall, while so employed by the day, be fed, housed and supervised in a separate place or part of the house of correction, and segregated from all other inmates not so employed." *Id.* However, nothing in § 86F dictates that *other* programs outside a correctional facility must subject inmates to the same restrictions, and the language employed by the Legislature in G. L. c. 127, §§ 48, 49, and 49A, contemplates the establishment of programs by the sheriff beyond "work release programs."[19]

As set forth in the "[p]olicy" of Policy and Procedure 467, the GPS program is "designed to promote reintegration and to test the readiness of inmates for release by maximizing an inmate's time in the community prior to his actual parole or discharge. The program allows an inmate to demonstrate his competence in a realistic living environment while monitored under strict conditions of accountability." Thus, where deemed appropriate by the sheriff in accordance with statutory authority, an inmate in the GPS program is allowed to participate in significant societal reintegration, subject to rigorous monitoring, rather than simply being employed in the community for several hours a day and returning to the house of correction at night. Put another way, the GPS program is simply not a "work release program" as described in G. L. c. 127, § 86F. Unlike pretrial confinement to one's home, an inmate participating in the GPS program remains at all times under the supervision of the sheriff and must satisfy the requirements of the GPS program set forth in Policy and Procedure 467 as the inmate continues to serve the committed

[18]A Department of Correction regulation defines "[w]ork [r]elease" as "[a] formal arrangement sanctioned by [G. L.] c. 127, §§ 48, 49, 49A, and 86F whereby an inmate is permitted to maintain approved and regular employment in the community." 103 Code Mass. Regs. § 902.01.

[19]Another type of program set forth in regulations pertaining to county correctional facilities is a "[c]ommunity [r]elease [p]rogram[]." See 103 Code Mass. Regs. § 952.01 (1999). The term "[c]ommunity [r]elease" is defined as "[r]elease into the community of an inmate in order to participate in work release, educational/vocational release, or [a] furlough program in accordance with the general laws and regulations governing such programs." 103 Code Mass. Regs. § 902.01. The regulation pertaining to "[c]ommunity [r]elease [p]rograms" states that "[t]he facility shall provide a program of release preparation which may include temporary release programs for all eligible inmates to prepare them for parole or discharge from the facility." 103 Code Mass. Regs. § 952.01.

portion of his sentence.[20] See G. L. c. 127, § 49 (committed offender enrolled in any program outside correctional facility "shall remain subject to the rules and regulations of the correctional facility and shall be under the direction, control and supervision of the officers thereof during the period of his participation in the program").

Here, when the sheriff permitted Donohue to participate in the GPS program, the sheriff did not impermissibly change the sentence imposed by the court. The statutory scheme pursuant to which the sheriff derives his authority does not mandate that the sheriff physically confine all offenders within the four walls of the house of correction for the entire length of the "committed" portions of their sentences. To the contrary, the statutory scheme confers on the sheriff the authority to permit certain eligible inmates to participate in a variety of programs outside the correctional facility. Because Donohue's placement on the GPS program was authorized by G. L. c. 127, §§ 48, 49, and 49A, it was "incorporated" into the court's sentence. See *Ierardi, petitioner*, 366 Mass. 640, 650 (1975) (actions taken by executive branch pursuant to statute are read into court's sentence and do not infringe on powers of judiciary); *Sheehan, petitioner*, 254 Mass. 342, 345 (1926) ("existing pertinent statutes are read into and made a part of the sentence imposed by the court"). We conclude that the actions of the sheriff were within his statutory powers.[21]

---

[20]General Laws c. 127, § 49, states that "[i]f any inmate who participates in any program outside a correctional facility established under the provisions of [§ 48] leaves his place of employment, or having been ordered by the . . . administrator [of a county correctional facility] to return to the correctional facility, neglects or refuses to do so, said inmate shall be held to have escaped from said prison or institution . . . ." G. L. c. 127, § 49. See Policy and Procedure 467.11 (escape). The language of § 49 plainly suggests a legislative intent to treat an offender enrolled in a program outside a correctional facility as nevertheless constructively within a penal institution for escape purposes. See *Commonwealth* v. *Best*, 381 Mass. 60, 63 (1980) (upholding conviction of escape where inmate was participating in work release program because, under G. L. c. 127, § 86F, inmate who leaves place of employment shall be held to have escaped from his place of confinement). Cf. *Commonwealth* v. *Hughes*, 364 Mass. 426, 429 (1973) (for purposes of escape, "prisoner is as much in the custody of the correctional facility when he is on furlough as when he is physically within its walls").

[21]The judge below expressed concern that the continuation of the GPS

4. *Conclusion.* The portion of the October 2, 2007, order of the Superior Court directing the sheriff to keep Donohue in custody in the house of correction until he has served the sentence imposed by the court is reversed. The portion of the October 2, 2007, order directing the sheriff to return to custody in the house of correction any other committed offender sentenced by a judge of the Superior Court who has not served the sentence imposed by the court, but has been released pursuant to the GPS program, is vacated.

*So ordered.*

COWIN, J. (dissenting). In concluding that the sheriff has statutory authority to conduct the GPS program, the court acknowledges that the release program at issue here must be authorized by the Legislature. Once that acknowledgment has been made, the court's position becomes untenable because applicable statutes provide no such authorization. Contrary to the view of the court, these statutes are not merely silent on the subject; they expressly forbid the release that took place in this case.

An administrative agency "has only the powers and duties expressly conferred upon it by statute and such as are reasonably necessary to carry out its mission." *Morey* v. *Martha's Vineyard Comm'n*, 409 Mass. 813, 818 (1991). It does not have the inherent authority to issue regulations, promulgate rules, or, as in the instant case, create policies and procedures that conflict with or exceed the authority of the enabling statutes. See *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.*, 412 Mass.

---

program could affect the administration of justice because uncertainty about the length of time a defendant actually will serve could affect a judge's decision to sentence an inmate to the house of correction, rather than to a State prison. There is always some degree of uncertainty, from a judge's perspective, about the precise amount of time that a defendant will serve within the physical confines of a house of correction. The judge will not know, for instance, whether a defendant may be paroled after having served only one-half of his sentence. Moreover, in all likelihood, it will be the seriousness of the offense and the defendant's criminal background that will dictate whether a defendant is sentenced to a house of correction or a State prison. See generally *DuPont* v. *Commissioner of Correction*, 448 Mass. 389, 394 & n.12 (2007) (differentiating sentence to house of correction from sentence to State prison).

340, 342 (1992). An agency regulation or policy "that is contrary to the plain language of the statute and its underlying purpose may be rejected by the courts." *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 646 (2000).

Here, Donohue was sentenced to two and one-half years in the Billerica house of correction, eighteen months to be served, with the balance suspended for four years, pursuant to G. L. c. 90, § 24, see *ante* at 259 n.6. Thus being sentenced, Donohue became a "committed offender" as defined in G. L. c. 125, § 1 (*c*), which states that a "committed offender" is "a person convicted of a crime and committed, under sentence, to a correctional facility." A "correctional facility" is defined by statute as "any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law." G. L. c. 125, § 1 (*d*). The sheriff may release committed offenders from correctional facilities under limited circumstances set forth expressly in G. L. c. 127, §§ 48, 49, and 86F, the statutory scheme governing work and education release.[1,2] No language in these provisions (or any others) permits the release program as presently implemented.

There is language, however, that expressly forbids such a program. In approving the GPS program, the court simply ignores language in G. L. c. 127, §§ 48 and 49, that is unfavorable to its position. Section 48, while authorizing the Commissioner of Correction and administrators of county correctional facilities to make available to committed offenders "education, training and employment programs" outside their facilities, states that such programs shall be "subject to the restrictions set forth in [§§ 49 and 86 F]." G. L. c. 127, § 48. Section 49 states:

"The commissioner or such administrator shall make

---

[1]Committed offenders may also be released into the community pursuant to G. L. c. 127, § 90A, which governs furloughs and temporary releases, and which is not at issue in this case.

[2]"Community release" is defined in general by 103 Code Mass. Regs. § 902.01 (1999) as the "[r]elease into the community of an inmate in order to participate in work release, educational/vocational release, or furlough program in accordance with the general laws and regulations governing such programs." Any community release program would thus be governed by G. L. c. 127, §§ 48, 49, 86F, and 90A.

and promulgate rules and regulations regarding programs established under [§ 48] outside correctional facilities. Such rules and regulations shall include provisions for reasonable periods of confinement to particular correctional facilities before a committed offender may be permitted to participate in such programs and provisions for feeding, housing and supervising participants in such programs in such manner as will be calculated to maintain morale and prevent the introduction of contraband to the facility."

The key language here is that "before" a committed offender is allowed to participate in any program outside of a correctional facility, the commissioner must arrange for "reasonable periods of confinement to particular correctional facilities." That is, one precondition for participation in any outside program is that housing must be prepared for the participating inmates in "particular correctional facilities" during their involvement in that program. It follows that housing outside of "correctional facilities" is not authorized.[3] This interpretation is reinforced by language referring to housing the inmate "in such manner as . . . to . . . prevent the introduction of contraband to the facility." If the inmate could live at home, there would be no need for a requirement that he be housed in a manner to prevent him from bringing contraband into the institution.

That the Legislature contemplated the continued confinement of inmates in facilities despite their participation in outside programs is supported by two more provisions found in §§ 48 and 49. First, § 49 states:

"If any inmate who participates in any program outside a correctional facility . . . leaves his place of employ-

---

[3]The use of the word "before" is intended to mean that this is a condition that must be fulfilled before an inmate may participate in a program, i.e., the commissioner or administrator must arrange for the inmate's continued incarceration before the inmate can be sent to a program. In contrast, the court's argument that "before" does not impose a condition, but only means that the inmate must be incarcerated for some time before he is eligible for a program, see *ante* at 266 n.16, makes no sense. That interpretation would only repeat what the statute provides at the beginning of § 49, i.e., that the commissioner or administrator may permit an inmate "who has served such a portion of his sentence . . . that he would be eligible for parole within eighteen months" to participate in outside programs. G. L. c. 127, § 49.

ment, or having been ordered by the commissioner or such administrator to return to the correctional facility, neglects or refuses to do so, said inmate shall be held to have escaped [from prison] . . . ." G. L. c. 127, § 49.

This provision addresses only two sites, the correctional facility and the place of employment, from which an inmate in an outside program may escape. No mention is made of another place, such as an inmate's house, where the inmate may be located for a sufficiently lengthy period of time and from which he might attempt to escape. Read in the context of the first quoted provision, the escape clause further supports the interpretation that the Legislature did not intend inmates in outside programs to be released into their own homes for the duration of their sentences. Last, §§ 48 and 49 apply to both county jails, as is the case here, and State prisons. It is highly unlikely that the Legislature would have intended the release of significant numbers of convicted criminals, including those serving time in State prison, into the community without so much as a mention of it in a detailed and comprehensive statutory framework.

Instead, the statutes contemplate that an inmate taking part in an education, training, or employment program outside a correctional facility will continue to be housed in a facility while participating in the program. Donohue's personal residence is not a "facility."[4] See *Commonwealth* v. *Morasse,* 446 Mass. 113, 120 (2006) ("Being restricted to one's home is not the equivalent of being incarcerated"). The GPS program, by releasing a committed offender into his own home, thus exceeds the sheriff's authority under governing law.

It is clear that the practice of releasing inmates to home confinement has been adopted at least in part as a device to alleviate overcrowding in correctional facilities.[5] I recognize that Massachusetts faces a persistent condition of overcrowding of

---

[4]A "[f]acility" is defined as a "place, a building (or part thereof), a set of buildings (to include the staff and services), that is used for the lawful custody or treatment of individuals. A facility may be owned or operated by public or private agencies." 103 Code Mass. Regs. § 902.01.

[5]See *ante* at 259 n.5, where the court states the view of the Secretary of Public Safety that "the discontinuation of electronic monitoring programs could be devastating to overcrowding problems and to societal reentry efforts."

its places of confinement. Solution of the problem invites various possible, albeit unattractive, remedies. The government can raise and expend funds to expand facility space, with the accompanying political strain of deciding in whose localities such expanded facilities shall be located. Alternatively, we could reduce certain sentences, thereby confining some convicted individuals for shorter periods of time. We could decriminalize certain offenses, thus removing those who commit these offenses from the incarcerated population altogether. There may well be other strategies, but I am certain that there are none that will be noncontroversial.

In our system of government, policy decisions of this nature are assigned to the Legislature. That body may act on its own or in response to initiatives of the executive branch. When the Legislature fails to act, it may be tempting for judges or executive officials to redress the vacuum and make the policy decisions themselves. This only creates further evasion of responsibility and public confusion regarding the roles of the different branches of the government.

Today, the court acknowledges that the release in question cannot lawfully take place without statutory authorization. Because the court, as well as the relevant executive branch officials, apparently believe that such release is in the public interest, they locate in the applicable statutes authorization that simply is not present. Indeed, for the reasons I have stated, the statutes fairly read forbid inmate release. It is not for us as judges to approve or disapprove of policy decisions; our function, within constitutional limits, is to apply the statutes as written. Accordingly, I respectfully dissent.