NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-449

GUARDIANSHIP OF W.T.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a judge of the Probate and Family Court found the respondent, W.T., to be an incapacitated person, and entered a decree and order pursuant to G. L. c. 190B, § 5-306 (b), appointing a limited guardian to, amongst other things, monitor the administration of W.T.'s antipsychotic medications. The treatment plan authorized the administration of Haldol decanoate (a long-acting medication administered via injection), with authorization for the use of daily oral doses of Haldol, daily oral doses of Risperdal (Risperidone), or monthly injections of Invega Sustenna (Paliperidone Palmitate) as "alternative antipsychotic medication[s]."

W.T. appeals, arguing that there was insufficient evidence that he is an "incapacitated person" for the purposes of G. L. c. 190B, § 5-101 (9).  W.T. further argues that the evidence was insufficient to establish that he was not competent to make an informed treatment decision or that, if W.T. were incapacitated,

his substituted judgment would be to consent to the administration of Haldol decanoate. Finally, W.T. argues that, to the extent that the judge's order authorized the administration of alternative medications, it was premature. Assuming, without deciding, that the evidence was sufficient to find that W.T. was an incapacitated person, the guardianship was not appropriately limited in scope, as the judge did not make the necessary subsidiary findings that would establish a nexus between W.T.'s underlying condition and the scope of the guardianship. Accordingly, we vacate the decree and order and remand the matter for further proceedings.

Background. On June 17, 2019, the Department of Mental Health (department) petitioned the Probate and Family Court, seeking to appoint Shelly Oakes as a permanent guardian of W.T. and to authorize treatment of W.T. with antipsychotic medication in accordance with a treatment plan. On September 25, 2019, by agreement of the parties, a judge appointed Oakes as a temporary guardian.

Based on the evidence at trial, the judge found as follows. W.T. was involuntarily committed to the Dr. Solomon Carter Fuller Mental Health Center (SCF) in 2011 under G. L. c. 123, §§ 7, 8; eight years later, W.T.'s application to the department to be admitted to SCF on a "conditional voluntary basis" was

2

approved and he resided there at the time of trial.  See G. L. c. 123, §§ 10, 11.

W.T. was sixty-seven years old and had a diagnosis of schizoaffective disorder, bipolar type.  W.T. testified that he understood he has been diagnosed with a mental illness, "but that doesn't mean [he has] to agree with it."  W.T. takes antipsychotic medications to treat his condition.  Dr. Marco Caicedo, W.T.'s treating psychiatrist for the prior three years, testified that in 2018, W.T. complained of side effects from the antipsychotic medication Trilafon.  Dr. Caicedo changed W.T.'s antipsychotic medication to Haldol, initially in oral tablets and liquid (Haldol P.O.).  After several months, Dr. Caicedo started administering Haldol decanoate, which, as we have noted, was administered in long-acting injections.  W.T. has requested that the medication be switched back to Haldol P.O. due to soreness in his muscles where the shot was administered, but Dr. Caicedo declined the request.[1]  The judge credited Dr. Caicedo's testimony that as of the time of trial, W.T. was accepting his antipsychotic medications and was compliant with taking them and that his behavior had been in control.

_____

[1] Dr. Caicedo testified that Haldol decanoate is the best way to deliver the medication but the transcript of his explanation for that conclusion is unclear, apparently due to "distortion" in the hearing recording.  No party sought to reconstruct the record either pursuant to Mass. R. A. P. 8 (c), as appearing in 481 Mass. 1611 (2019), or any other procedural rule.

Since 2018, W.T. has had increased privileges at SCF. He has been permitted to visit other areas of the hospital outside of his locked ward, and he can go off-site for walks and shopping if he is supervised. In addition, W.T. handles his own financial matters, including doing his own banking off-site.

W.T. experienced significant weight loss over the several months and years prior to trial.[2] He suffered diarrhea for three months. Magnetic resonance imaging revealed a lesion of unknown cause on his left lung. W.T. refused further testing, such as a biopsy or other scans, to diagnose the cause of the lesion.[3]

---

[2] W.T. testified that when he entered SCF, he weighed 210 pounds, that his weight dropped to between 150 to 160 pounds, and that over a two month period of time it dropped quickly to "113, 118 pounds" due to diarrhea before rebounding to 126 pounds at the time of trial.

[3] W.T. argues that the judge's finding that W.T. refused "X-Rays, CAT scan or biopsy" was unsupported by the record and should be stricken. This finding was consistent with W.T.'s own proposed findings of fact and rulings of law, which also interpreted Dr. Caicedo's testimony to mean that "Respondent has refused to undergo further x-rays[,] a CAT scan[,] or biopsy to investigate his condition." Indeed, Dr. Caicedo testified that W.T. refused a "complete scanning of the body," and when he was asked if W.T. would agree to a biopsy, Dr. Caicedo testified that W.T. was refusing "any other kind of interventions." W.T. also contends that the judge improperly used the term "mass" instead of "lesion" in her decision and the word should be stricken. The judge used the term "lesion" through the decision, and any lack of precision in one reference to "a mass" did not affect the outcome of the decision. Similarly, W.T. argues that the judge's finding that he had "chest pain" was unsupported by the record and should be stricken. Yet, there was record evidence that he took prescription drugs that are used to treat chest pain, and in his proposed findings of fact, W.T. acknowledged that "[h]e also has a prescription for nitroglycerin for chest pain." W.T. testified that his primary care physician informed

4

Dr. Caicedo did testify, however, that W.T. was compliant with medication for several other health conditions, including diabetes, coronary artery disease, gout, high cholesterol, acid reflux, and chest pain, and that W.T. understood the risks and benefits of refusing or accepting them.

The judge also found that W.T. has been classified as a level three sex offender by the Sex Offender Registration Board (SORB). The classification requires that W.T. register with SORB upon discharge from SCF to a community residence. See G. L. c. 6, § 178K (2) (c). While W.T. has expressed a desire to leave SCF, he believes the classification was an error and he has informed Dr. Caicedo that he will never willingly register if discharged; instead, he blamed the department for his inability to live outside the facility.[4]

Crediting Dr. Caicedo's testimony, the judge found that W.T. "has poor insight into the risks and benefits of medical intervention." The judge determined that W.T.'s "clinically

_____

him he did not need a biopsy. The judge did not find this testimony credible.

[4] W.T. argues that the finding that he "believes that he would become . . . [a] suspect for . . . unsolved sexual crimes . . . and harassment and retaliation . . . [as] a Registered . . . sex offender" was clearly erroneous. While that finding appears unsupported by the record before us, the error "did not materially contribute to the judge's ultimate conclusions that [the department] had met its burden." Guardianship of C.A., 102 Mass. App. Ct. 392, 398 (2023).

diagnosed condition" results in "an inability to receive and evaluate information or make or communicate decisions to such an extent that [he] lacks the ability to meet essential requirements for physical health, safety, or self-care, even with appropriate technological assistance," thus rendering him an "incapacitated person" under G. L. c. 190B, § 5-101 (9). Despite having found that W.T. had accepted his prescribed medications of Haldol P.O. and Haldol decanoate -- and had been in behavioral control since he started taking them -- the judge concluded that W.T. lacked "the present capacity to make informed decisions regarding . . . psychiatric treatment, including, but not limited to treatment with antipsychotic medication," and authorized Oakes to "monitor the administration of [W.T.'s] antipsychotic medications."  Under the decree and order, W.T. retained the right to "make and communicate routine health care decisions" and to manage the intake of non-antipsychotic medications.  W.T. retained other rights as well, such as to self-care, choosing his leisure activities, determining his friendships and visitations, and "seek[ing] legal assistance in proceedings before the SORB and/or appropriate courts to determine his obligation to register with the SORB."

The judge appointed Oakes as W.T.'s limited guardian.  The judge found that "the substituted judgment of [W.T.], if not

6

incapacitated[,] would be to consent to the proposed treatment" plan already described. The judge ordered that the proposed plan be implemented, monitored by Oakes, and then reviewed by the court in twelve months. The judge also ordered that "Dr. Caicedo shall consider whether it is possible for [W.T.] to resume taking oral Haldol to avoid muscle pain from injections, if possible" but that it was "in Dr. Caicedo's sole discretion to determine whether a transition to oral Haldol is possible." W.T. filed a timely notice of appeal.

Discussion. To meet the standard for appointment of a guardian and issuance of a substituted judgment treatment order, the department was required to prove by a preponderance of the evidence that W.T. was an incapacitated person within the meaning of G. L. c. 190B, § 5-101 (9), and that, if he were not incapacitated, W.T. would choose to be treated by Haldol decanoate. See Guardianship of A.R., 99 Mass. App. Ct. 349, 353, 358 (2021); G. L. c. 190B, § 5-306A. We review the judge's ruling for abuse of discretion or other error of law. See Guardianship of Linda, 401 Mass. 783, 786-787 (1988). "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable

7

alternatives" (quotation and citation omitted).  <u>L.L.</u> v.

<u>Commonwealth</u>, 470 Mass. 169, 185 n.27 (2014).

1.  <u>Sufficiency of the evidence</u>.  W.T. argues that the

evidence was insufficient to support the judge's finding that he

was an incapacitated person.  Specifically, W.T. contends that

by using the term "incompetence," the judge applied the wrong

legal standard by conflating the statutory definition of an

incapacitated person with the common-law test for competency to

give informed consent and that the decision was based on clearly

erroneous findings.

a.  <u>Definition of incapacitated person</u>.  As defined in

G. L. c. 190B, § 5-101 (9), an "incapacitated person" is:

> "an individual who for reasons other than advanced age or
> minority, has a clinically diagnosed condition that results
> in an inability to receive and evaluate information or make
> or communicate decisions to such an extent that the
> individual lacks the ability to meet essential requirements
> for physical health, safety, or self-care, even with
> appropriate technological assistance."

In concluding that W.T. was an incapacitated person, the judge

cited to that statute and closely paraphrased that definition.

The fact that the judge sometimes used the words "incompetence"

and "incompetent," the terminology used in cases that predate

the adoption of § 5-101 (9), see St. 2008, c. 521, § 9, does not

mean that the judge applied the incorrect definition of an

incapacitated person.  See Guardianship of C.A., 102 Mass. App. Ct. 392, 396 (2023).[5]

b.  Scope of guardianship.  W.T. concedes that he has a clinically diagnosed condition:  schizoaffective disorder, bipolar type.[6]  We assume for the sake of argument that this condition "result[ed] in an inability to receive and evaluate information or make or communicate decisions to such an extent that he lacked the ability to meet the essential requirements for physical health, safety, or self-care, with appropriate technological assistance."[7]  G. L. c. 190B, § 5-101 (9). Nonetheless, the appointment of a limited guardian would need to be appropriately limited in scope.  See Guardianship of D.C., 479 Mass. 516, 523-524 (2018); Guardianship of C.A., 102 Mass. App. Ct. at 397.

---

[5] When ruling on the petition, the judge did not have the benefit of Guardianship of C.A., which issued while this appeal was pending.

[6] According to Dr. Caicedo, when that disorder is left untreated, W.T. is "acutely psychotic" and "delusional."

[7] W.T. argues that the judge's finding that he does not have the present capacity to make informed decisions regarding his personal affairs, general medical affairs, and psychiatric treatment was clearly erroneous as Dr. Caicedo testified that he discussed routine medical care with W.T. and that W.T. "seems to understand the risks and benefits of refusing or accepting . . . medications" for diabetes, hyperlipidemia, gout, acid reflux, and for chest pain.  However, simply because W.T. could understand the risks of some conditions does not preclude the judge from finding that he was incapacitated from making other decisions.  See Guardianship of C.A., 102 Mass. App. Ct. at 397-398.

9

"A guardianship may be general or limited in scope.  See G. L. c. 190B, § 5-303 (a) ('An incapacitated person or any person interested in the welfare of the person alleged to be incapacitated may petition for a determination of incapacity, in whole or in part, and the appointment of a guardian, limited or general')."  Guardianship of D.C., 479 Mass. at 523.  A person may have the capacity to make some decisions but may be an "incapacitated person" within the meaning of § 5-101 (9) for others.  See Guardianship of Bassett, 7 Mass. App. Ct. 56, 64 n.9 (1979).  When filing a petition for a limited guardianship, the petitioner must "define the scope of the guardianship." Guardianship of D.C., supra.  "Consistent with the purpose underlying the Legislature's 2008 adoption of the guardianship provisions of the Uniform Probate Code, see St. 2008, c. 521, the ability to create a limited guardianship is intended to maximize the liberty and autonomy of a person subject to guardianship."[8]  Guardianship of B.V.G., 474 Mass. 315, 323

---

[8] "The Massachusetts Uniform Probate Code Prefatory Note to article V provides, in part, 'The call for "limited guardianship" was a call for more sensitive procedures and for appointments fashioned so that the authority of the protector would intrude only to the degree necessary on the liberties and prerogatives of the protected person.  In short, rather than permitting an all-or-none status, there should be an intermediate status available to the courts through which the protected person will have personal liberties and prerogatives restricted only to the extent necessary under the circumstances. The court should be admonished to look for a least-restrictive protection approach.' Article V, Protection of Persons Under

10

(2016).  "Courts must exercise the authority conferred on them to 'encourage the development of maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's limitations or other conditions warranting the procedure.' G. L. c.  190B, § 5-306 (a)."  Guardianship of D.C., supra at 523-524.

The statutory purpose is further explained in the comment accompanying the Uniform Probate Code:

> "The purpose of subsections (a) and (c) is to remind an appointing court that a guardianship under this legislation should not confer more authority over the person of the [incapacitated person] than appears necessary to alleviate the problems caused by the [person's] incapacity.  This is a statement of the general principle underlying a 'limited guardianship' concept."

Guardianship of B.V.G., 474 Mass. at 322, quoting Uniform Probate Code prior § 5-306 comment, 8 U.L.A. (Part III) 186 (Master ed. 2013).

The judge found that W.T. was an incapacitated person based in part on his clinical diagnosis, his weight loss, diarrhea, the untreated lesion on his left lung, and his refusal to register as a level three sex offender.  However, as to the Haldol, she found that W.T. "has accepted the Haldol medication

---

Disability and Their Property, Prefatory Note, in The New MUPC Is Here . . . and Now at 227 (Mass. Cont. Legal Educ. 2012)." Guardianship of D.C., 479 Mass. at 523 n.3.

through the present time," and that "since his acceptance for care and treatment on a conditional voluntary basis, [W.T.] has accepted his prescribed anti-psychotic medications of Haldol and Haldol decanoate." The judge did not make a finding that W.T. had stopped taking either form of the Haldol, nor did she find that there was a therapeutic difference between the Haldol decanoate and the Haldol P.O.[9]

We conclude that the guardianship was not properly limited to achieve the purposes of G. L. c. 190B, § 5-306. The comment accompanying the statute makes clear that there must be a nexus between the reason for the guardianship and the scope of the guardianship. Here, the guardianship conferred "more authority over the person of the incapacitated person than appears necessary to alleviate the problems caused by the person's incapacity." G. L. c. 190B, § 5-306 comment. The example in the comment is illustrative, as it explains that "if the principal reason for the guardianship is the [incapacitated person]'s inability to comprehend a personal medical problem, the guardian's authority could be limited to making a judgment, after evaluation of all circumstances, concerning the

---

[9] While Dr. Caicedo testified that W.T. stopped taking the Haldol P.O., the judge did not make a finding that W.T. did, nor did the judge state whether she credited Dr. Caicedo's testimony on this point.

12

advisability and form of treatment and to authorize actions necessary to carry out the decision." Id.

Here, while there was testimony that W.T. did not comprehend the risks of his weight loss and lung lesion, the guardianship did not relate to those concerns. Instead, the guardianship permits W.T. to make all routine health care decisions and to manage all of his non-antipsychotic medications, while appointing a guardian to make decisions based on his antipsychotic medications, which is at the heart of the issue in determining W.T. to be an incapacitated person. Where the judge found that W.T. has accepted his antipsychotic medications and did not make a finding either that W.T. did not appreciate the need to control his mental illness with antipsychotic medications or that one form of Haldol was superior to the other at reducing his symptoms and assisting him with the activities with which he struggled, there is no nexus between the scope of the guardianship and W.T.'s underlying condition. We therefore conclude that the judge abused her discretion in appointing a limited guardianship to manage W.T.'s antipsychotic medications.

Conclusion. The decree and order is vacated, and the case

13

is remanded for further proceedings consistent with this memorandum and order.[10]

> So ordered.
>
> By the Court (Rubin, Henry & Hand, JJ.[11]),
>
> *Joseph F. Stanton*
>
> Clerk

Entered:  September 13, 2023.

---

[10] Because we conclude that the guardianship was not properly limited, we need not address the remaining issues in W.T.'s brief as they relate to the substituted judgment determination and the alternative medications under the treatment plan. However, we note that "in Massachusetts there is 'a general right in all persons to refuse medical treatment in appropriate circumstances,' and that right extends to 'an incompetent, as well as a competent, patient.'"  Zaleskas v. Brigham & Women's Hosp., 97 Mass. App. Ct. 55, 62 (2020), quoting Superintendent of Belchertown State Sch. v. Saikewicz, 373 Mass. 728, 745-746 (1977).  In addition, we note that Dr. Caicedo was offered as an expert in psychiatry, but not as to the other health related issues W.T. faced, and upon which the judge ultimately relied when appointing the guardian.

[11] The panelists are listed in order of seniority.

14